## COMMONWEALTH *vs.* SEAN K. ELLIS.

Suffolk. September 8, 2000. - December 6, 2000.

Present: MARSHALL, C.J., ABRAMS, IRELAND, SPINA, & SOSMAN, JJ.

*Constitutional Law,* Double jeopardy, Confrontation of witnesses. *Practice, Criminal,* Double jeopardy, Mistrial, Verdict, Instructions to jury, Capital case. *Evidence,* Impeachment of credibility, Bias of government witness, Cross-examination, Identification. *Witness,* Bias, Credibility, Impeachment. *Identification. Felony-Murder Rule. Homicide. Joint Enterprise.*

At the first trial and retrial of a murder indictment, there was no error in the judge's instructions to the jury and manifest necessity for a mistrial was created by the juries' deadlock at both trials; further, there was no evidence that the judge acted in bad faith such as would support the defendant's claim that double jeopardy principles precluded a third trial. [749-752]

At a murder trial, error, if any, in the judge's restriction of the defendant's cross-examination of a witness regarding her bias, did not require reversal of the conviction, where the witness's testimony was not critical to the Commonwealth's case, where variations in the witness's testimony were slight, and where the witness was cross-examined vigorously. [754-755]

At a murder trial, the judge did not abuse his discretion in limiting impeachment of a witness with evidence of an unrelated incident, where the witness was cross-examined vigorously with respect to her initial failure to identify the defendant and her ability to perceive and remember, where the jury could reasonably infer that the misidentification was made out of fear of retaliation, and where the proffered evidence could have confused the jury. [757-761]

This court declined to endorse a requirement that a jury specify whether they convicted the defendant as a principal or as a joint venturer. [761]

Evidence at a murder trial was sufficient to warrant submission of the case to the jury on the theory that the defendant was either the principal or a joint venturer. [761-762]

At the trial of a murder indictment there was sufficient evidence from which the jury could infer that, at the time of the killing, the defendant was aware that his codefendant was armed or the defendant possessed the murder weapon himself. [762-763]

In light of the evidence at a murder trial that the victim was shot in the head five times at close range, there was no substantial likelihood that the jury did not base their verdict on at least one of the factors relative to extreme atrocity or cruelty delineated in *Commonwealth* v. *Cunneen,* 389 Mass. 216, 227 (1983). [763-764]

A Superior court judge did not err in denying a defendant's motions for a new trial and for reconsideration of his motion to suppress identification in a

murder case, where the defendant did not carry his burden of showing that the identification procedure was unnecessarily suggestive. [764-765]

INDICTMENTS found and returned in the Superior Court Department on October 27, 1993.

A pretrial motion to suppress evidence was heard by *Robert W. Banks*, J.; the cases were tried before *James D. McDaniel, Jr.*, J., and a motion for a new trial was heard by him.

*David Duncan* for the defendant.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. After two mistrials, the defendant, Sean K. Ellis, was convicted of murder in the first degree on theories of extreme atrocity or cruelty and felony-murder. He was also convicted of armed robbery. The defendant appeals from his convictions and from the denial of his motion for a new trial. On appeal, he claims that the trial judge erred in (1) declaring a mistrial after the second trial in violation of the defendant's constitutional right against double jeopardy, (2) limiting examination of two critical Commonwealth witnesses in violation of his confrontational and due process rights, (3) improperly instructing the jury, and (4) denying the defendant's motion for a new trial and motion to reconsider the denial of the defendant's motion to suppress. We affirm the convictions. After reviewing the entire record pursuant to G. L. c. 278, § 33E, we decline to grant the defendant a new trial or to reduce the degree of guilt on the murder conviction.

We recount the evidence in the light most favorable to the Commonwealth, *Commonwealth* v. *Gilbert*, 423 Mass. 863, 864 (1996), reserving certain facts relevant to the defendant's arguments discussed below. The murder victim, Detective John Mulligan of the Boston police department, was shot five times in the head in the early morning hours of September 26, 1993, while working a paid security detail in the parking lot of a Walgreens drug store in the Roslindale section of Boston. At approximately 2:45 or 3 A.M. the defendant, Terry Patterson, and a woman arrived at the Walgreens. They traveled in Patterson's brown automobile. The vehicle had tinted windows, "custom wheels," and a "racing bra" on the front grill.

At about 3:05 A.M., Rosa Sanchez and her husband arrived at the Walgreens. She saw the victim asleep in the front seat of his

truck. Although the truck was not an official police vehicle, the victim's uniform and orange raincoat indicated that he was a police officer. As she walked past the victim's truck, she noticed a man, later identified by her as the defendant, crouching beside it. After making eye contact with the man, she entered the Walgreens and was in there for approximately twenty minutes. As she left the store, Rosa Sanchez again saw the defendant, this time with Patterson near the public telephones outside of Walgreens. At roughly the same time, Evoney Chung also saw two individuals fitting the description of the defendant and Patterson near the telephones. At about 3:35 A.M., another witness observed the brown automobile speeding away from a sidewalk near Walgreens.

At approximately 3:45 A.M., a Walgreens employee approached the victim's car and saw that the victim's face was covered with blood. Another employee placed a 911 call that was recorded at 3:49 A.M. Paramedics soon arrived and determined that Mulligan had been shot several times in the face and had no vital signs. The victim's sweater had been pulled up, his holster was empty, and his department issued handgun was missing. The victim was taken to a hospital where he was pronounced dead. An autopsy later determined that the five shots had been fired at close range and that any one of them could have been fatal.

On September 30, 1993, the police questioned the defendant. He told detectives that he had gone to the Walgreens at about 2:45 or 3 A.M. on September 26. He acknowledged entering the Walgreens and purchasing diapers, and that he had used a public telephone, but denied any involvement in the murder. Meanwhile, that same day, the defendant's girl friend accompanied the defendant to an apartment where he retrieved a bag. On returning to his girl friend's apartment, the defendant removed two guns from the bag. One of the guns was a black nine millimeter Glock handgun; the other was a silver .25 caliber Raven handgun. The next day (October 1, 1993), a friend of the defendant retrieved the guns from the girl friend's apartment and hid them in a field. On October 7, 1993, the police found the guns. Subsequent investigation revealed that the nine millimeter Glock was the victim's service weapon and the .25 caliber Raven handgun was the murder weapon.

The police also identified Patterson's fingerprints on the driver's side door of the victim's truck. No fingerprints of the

defendant were found. The police also located Patterson's automobile; it had no registration plates and there was evidence that part of the window tinting had been removed.

On October 5, 1993, Rosa Sanchez reviewed a photographic array of possible suspects at the Boston homicide unit. The facts surrounding the photographic array are explored in more detail below, but we note now that Sanchez initially identified someone other than the defendant. After a short break, Sanchez was again shown the photographic array and identified the defendant's photograph as the man she had seen crouching beside the victim's car. On October 18, 1993, Sanchez chose the defendant from a police lineup and again identified him as the man she had seen crouching near the victim's car.

On October 27, 1993, a Suffolk County grand jury returned indictments charging the defendant with murder, armed robbery, and possession of firearms without a license. The defendant filed a pretrial motion to suppress the photographic identification evidence. After a three-day evidentiary hearing, a Superior Court judge (the suppression judge) denied the motion. On September 14, 1995, after two mistrials (discussed below), a third jury convicted the defendant. On September 29, 1998, the defendant moved for a new trial and a reconsideration of the denial of his motion to suppress the identification. On March 4, 1999, the defendant's motion was denied, and this appeal followed.

1. *Double Jeopardy.*

The defendant contends that his third trial violated both his constitutional and common-law double jeopardy rights. In particular he argues that, at the close of the second trial, the trial judge erred by repeating his original joint venture instruction — rather than tailoring a more direct answer — in response to a question submitted by the jury. Moreover, he claims such conduct constituted bad faith on the part of the trial judge because it was foreseeable that refusing to answer the jury's question was likely to result in a deadlock. As a result, the defendant continues, the judge should not have declared a mistrial as a manifest necessity, and the third trial should have been barred on double jeopardy grounds. We do not agree.

Ellis's first trial began on January 4, 1995. On January 12, prior to sending the jurors to deliberate, the judge instructed the jury on murder and on the theory of joint venture. On January 13 and again on January 17, the jury requested additional

instructions on joint venture. On January 19, the jury asked the judge the following question: "[I]n considering the rule of joint venture, does conscious concealment of a known murder weapon constitute aiding and abetting?" The judge rejected the defendant's proposed answer[1] and responded as follows: "That question is phrased in such a way that it is really out of the context of the entire evidentiary picture in this case, and I can't answer a question like that that is taken out of context in that fashion. I am not disparaging you in any way, but it is couched in such terms that I cannot directly answer that question." On January 21, 1995, the jury reported themselves deadlocked on the charges of murder and armed robbery, and the judge declared a mistrial.

On March 21, 1995, the second trial began before the same judge. On March 30, 1995, the judge instructed the jury on the elements of murder and on the theory of joint venture. The defendant objected to the judge's refusal to offer a proposed jury instruction.[2] On March 31, the jury requested additional instructions on joint venture and on murder in the first and second degrees. Later that day, the jury sent the judge a note stating, "Pursuant to the following concerns could you please reiterate *joint venture* only" (emphasis in original). In an accompanying note, the jury identified their concerns: "Joint venture. Recognition of crime after the fact. Defendant fleeing with the perpetrator of the crime from scene of crime without prior knowledge of crime or participation of crime constitutes joint venture. Acceptance of weapons immediately after crime.

---

[1]The defendant asked the judge to give the following response: "It is not enough to find the defendant Sean Ellis guilty of murder or armed robbery as a joint venturer to conclude that he assisted the principal or principals in some way after those crimes had been committed, unless you find, beyond a reasonable doubt, that he was present at the time and place the offenses were committed, and that he intentionally assisted or stood ready to assist the perpetrator in committing those crimes while sharing with the other person or persons the mental state or intent required to convict the principal of those crimes."

[2]The defendant's proposed jury instruction emphasized that the Commonwealth "must prove more than mere association with the perpetrator of the crime either before the commission of the crime or after the commission of the crime" and that "[the jury] may consider the defendant's mental condition on the night in question, including any intoxication by voluntary consumption of alcohol, in determining whether or not the Commonwealth has proved beyond a reasonable doubt that the defendant intentionally assisted others in committing the crime and that he shared the intent required for committing the crime."

Holding and transfer of known murder weapon and known [blank]. Aiding and abetting after the fact with knowledge of the crime after crime was committed." The judge rejected the defendant's proposed response[3] and, over the defendant's objection, repeated his original joint venture charge in its entirety. On April 1, 1995, the jury reported they were deadlocked. The judge rejected the defendant's request that the jury be either dismissed or read the joint venture instruction he had proposed. Instead, the judge gave the jury a *"Tuey-Rodriquez"* charge. *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 98 (1973). Within two hours, the jury returned and again reported they were deadlocked. Over the defendant's objection, the judge ordered a mistrial on the ground of manifest necessity.

The defendant then moved to dismiss the indictments on the ground that a retrial would constitute double jeopardy under the United States Constitution. The motion was denied, as was the petition to a single justice of this court pursuant to G. L. c. 211, § 3.

Both the Fifth Amendment to the United States Constitution and the common law of Massachusetts prohibit the Commonwealth from placing a criminal defendant in double jeopardy. *United States* v. *Dinitz*, 424 U.S. 600, 606 (1976). *Commonwealth* v. *Cassidy*, 410 Mass. 174, 176 (1991). If the events at trial create a "manifest necessity" for a mistrial, a judge may properly declare one. *United States* v. *Dinitz*, *supra* at 606-607, quoting *United States* v. *Jorn*, 400 U.S. 470, 485 (1971) (plurality opinion). Accord *Ariel A.* v. *Commonwealth*, 420 Mass. 281, 289 n.8 (1995); *Commonwealth* v. *Horrigan*, 41 Mass. App. Ct. 337, 339-340 (1996). The "prototypical example" of a manifest necessity for a judge to declare a mistrial is a deadlocked jury. *Commonwealth* v. *Andrews*, 403 Mass. 441, 448-449 (1988).

Here, there was no double jeopardy for two reasons. First, the judge's failure to give the joint venture instruction requested by the defendant did not constitute error. Rather, for the judge to repeat the original joint venture charge was a reasonable response to the jury's request to *"reiterate* joint venture" (emphasis added). Moreover, had the judge changed his instruction to address the jury's specific concerns, he ran the risk of giving an erroneous instruction or further confusing them. *Com-*

---

[3]The defendant asked the judge to give the response he had requested at the first trial. See note 1, *supra*.

*monwealth* v. *Johnson*, 429 Mass. 745, 753-754 (1999) (necessity, extent, and character of supplemental instructions in response to jury's request fall within trial judge's discretion). The judge's decision to repeat an instruction that was proper, rather than giving the instruction requested by the defendant, was within his discretion. *Commonwealth* v. *Andrews*, *supra.*

Second, even if the judge erred, the defendant has not made the requisite showing of bad faith. *Commonwealth* v. *Andrews*, *supra* at 448. Absent evidence that the judge acted in bad faith, alleged judicial errors giving rise to a mistrial do not support a claim of double jeopardy. *Id.* at 448-449. *United States* v. *Dinitz*, *supra* at 611. The defendant's claim that a more pointed instruction would have avoided the deadlock is speculative. Without more, these unsubstantiated allegations do not warrant a finding of bad faith.

2. *The Defendant's Right of Confrontation.*

a. *Impeachment of Evoney Chung.* In March, 1995, between the defendant's first and second trials, Evoney Chung, a witness for the Commonwealth, was charged in the Dorchester Division of the District Court with possession of a Class D substance with intent to distribute. Prior to the second trial, the Commonwealth filed a motion in limine to prevent the defendant from examining her at trial about the charge. The trial judge granted the motion and excluded testimony on that issue. In May, 1995, between the second and third trials, the Commonwealth dropped the charge against Chung. At the third trial, over the defendant's objection, the judge again refused to allow the defendant to examine Chung about the charge. The defendant claims this impermissibly restricted his confrontational rights because he was not allowed to question Chung about her possible bias stemming from the dropped charge.

Chung testified at all three trials that, on September 26, she was at the Walgreens with her boy friend, Joseph Saunders; that she passed two black men as she left the store, and that she saw the same two men near the telephones as she and Saunders drove away. At all three trials she testified that she had not seen their faces. In these respects her testimony at the third trial was no different from her testimony at the two earlier trials. At issue is Chung's testimony regarding the time she arrived at the Walgreens which the defendant claims she changed as an act of repayment to the Commonwealth for dropping the charge against her.

In October, 1993, Chung made an initial statement to the police. At that time, she estimated that the movie she had seen ended at "about 3:10," and that she arrived at Walgreens between "about [3]:35 and 3:40 [A.M.]." On cross-examination at the first trial, when asked about the timing of her arrival at Walgreens, Chung answered, "I'm actually guessing at the time based on what time I believe the movie ended. It could have been between 3:20, 3:30 or even 3:35. I was not paying close attention to the time." When asked about her earlier statement to the police she stated, "I wasn't sure back then of the times, either; because . . . I didn't check my watch. When I got to Walgreens, I didn't check my watch. I just got out of the movie and went to Walgreens. So I couldn't give you an approximate time." On direct examination at the second trial, she placed her arrival time at "[r]oughly about 3:10. Somewhere around there." On cross-examination she narrowed her arrival time to "3:17, 3:20." At the third trial, after the charge had been dropped, Chung testified on direct examination that she arrived at Walgreens "after 3:00," and was inside for "ten or twelve minutes." She estimated that she left the store "before 3:30." The defendant then sought to cross-examine her about the dropped drug charge. At a sidebar conference, defense counsel told the judge that, in his view, Chung had changed her testimony several times, each time in favor of the Commonwealth, and argued that he should be able to question the witness about the drug charge and its relation to the changes in her testimony. The judge refused to permit that line of questions, reasoning that the change in testimony was not "significant enough" to warrant further inquiry. Thereafter, the defendant marked certain documents (i.e., the docket and the police report filed in conjunction with Chung's charges) for identification and questioned her about the prior time-related statements and testimony.

Chung's shift in testimony from "between 3:20, 3:30 or even 3:35" (first trial), "[r]oughly about 3:10" (second trial), and "after 3:00" arguably bolstered the Commonwealth's case by lending support to the testimony of Rosa Sanchez. Sanchez testified that she saw the defendant as she entered Walgreens at approximately 3:05 A.M. and again, when she left the store a little after 3:20 A.M. Accordingly, Chung's testimony at the first trial (an arrival time of 3:20 A.M.) meant that she might have seen the defendant in the parking lot after Sanchez left, while

Chung's testimony at the second trial (arrival at "[r]oughly about 3:10") and her testimony at the third trial (arrival "after 3:00") arguably suggested that she had seen the defendant at the same time Sanchez claimed to have seen him.

On appeal, the defendant renews his claim that he should have been allowed to cross-examine Chung as to the dismissed charges. If admitted, counsel could have argued (and the jury could have inferred) that Chung's change in testimony constituted a "favor" toward the Commonwealth for its dismissal of the charge. The question is, then, whether the defendant had a right to impeach Chung's testimony for bias.

For the purpose of showing bias, a criminal defendant is "entitled, as of right, to reasonable cross-examination of a witness . . . particularly where that witness may have a motivation to seek favor with the government." *Commonwealth* v. *Haywood*, 377 Mass. 755, 760 (1979), quoting *Commonwealth* v. *Dougan*, 377 Mass. 303, 310 (1979). "A defendant has the right to bring to the jury's attention any 'circumstance which may materially affect' the testimony of an adverse witness which might lead the jury to find that the witness is under an 'influence to prevaricate.' " *Commonwealth* v. *Haywood, supra,* quoting *Commonwealth* v. *Marcellino,* 271 Mass. 325, 327 (1930). Whether evidence demonstrates bias, however, falls within the discretion of the trial judge. *Commonwealth* v. *LaVelle,* 414 Mass. 146, 153 (1993). In the past, we have suggested that evidence of bias may be found where a witness has received a benefit from the Commonwealth, such as the dismissal of criminal charges. See *Commonwealth* v. *Rodwell,* 394 Mass. 694, 699-700 (1985), *S.C., post* 1016 (2000); Commonwealth v. *Connor,* 392 Mass. 838, 841 (1984) (receipt of benefits under Federal witness protection program "might have inspired gratitude"); *Commonwealth* v. *Gauthier,* 21 Mass. App. Ct. 585, 590 (1986) (considering whether prompt dismissal of criminal charge relevant to question of bias). It may have been error for the trial judge to preclude inquiry into the dismissed charge. However, even if the exclusion was improper, it did not amount to reversible error for several reasons.

First, contrary to the defendant's characterization, Chung's testimony about her arrival time was not "critical to the Commonwealth's case." The defendant admitted to using a public telephone outside the Walgreens at about 2:45 or 3 A.M. Moreover, Chung was one of four witnesses who saw a tall

black man and a short black man near Walgreens,[4] and one of
three witnesses who placed the two men at the telephones in the
parking lot.[5] She could not identify either individual and testi-
fied that she avoided making eye contact with them. Given this
context, it is clear that Chung's testimony was cumulative —
not crucial — to the Commonwealth's case. Even if evidence of
the dismissed charge had been admitted, its impact (and any
inferences drawn from it) would in all likelihood not have been
consequential. Accordingly, any error on the part of the judge
was harmless beyond a reasonable doubt. *Commonwealth* v.
*Babbitt*, 430 Mass. 700, 709 (2000).

We also note that Chung's testimony at the third trial is
consistent with her statements from the outset that she was
extremely uncertain as to the timing of her arrival and departure
from Walgreens. In her initial statement to the police, Chung
acknowledged that she had not been paying attention to the
time. In her testimony at each of the three trials, her estimates
were imprecise, and most were qualified by words such as
"guessing," "[r]oughly," and "[s]omewhere around there." The
prosecutor alluded to this in her argument at the close of the
third trial, stating that, when taken as a whole, the testimony of
the witnesses "fit together, [but] not perfectly. Because if they
fit together perfectly, wouldn't you scratch your heads and say:
'something is amiss here?' " A jury could rationally conclude
that the slight variations in Chung's testimony are attributable
to the imperfect nature of human recollection, rather than the
product of undisclosed bias.

Finally, through vigorous cross-examination, the defendant
exposed each of the variations in Chung's statements throughout
the course of the police investigation and subsequent trials. In
so doing, the defendant elicited information from which the jury
could conclude that Chung's recollection of time was unreli-
able. Given the cumulative nature of Chung's testimony, the
nature of the change in her testimony, and the defendant's op-
portunity to challenge her credibility, the judge's resolution of
this matter does not mandate a new trial.

b. *Impeachment of Sanchez.* Rosa Sanchez was a key witness
for the Commonwealth. At the third trial she testified that she
was at the Walgreens at 3 A.M. and, on entering the store, saw a

---

[4]The other three were Rosa Sanchez, Victor Brown, and Joseph Saunders.

[5]The other two were Rosa Sanchez and Joseph Saunders.

"guy crouching by [the victim's] car." During the brief encounter, she "looked at him" and he "looked up at [her]." On leaving the Walgreens, she saw the same person standing with another man at the telephones. As she and her husband drove from the parking lot, she again noticed both men.

On October 5, 1993, Detective Acerra (who was then living with Sanchez's aunt) and Detective Robinson drove Sanchez and her husband to the police department. Sanchez said she was "scared" at the time. Detective Ross testified that Sanchez appeared "frightened, nervous, scared, upset." At the police station, Sanchez was separated from her husband and escorted to a room where Detective Ross showed her two photographic arrays of eight photographs each; one containing a photograph of the defendant (defendant array) and one containing a photograph of Patterson (Patterson's array). Each array consisted of black males in the vicinity of the defendant's age, with similar skin tone and hairstyle. Detective Ross first showed Sanchez the defendant's array. After viewing the array for about five minutes, Sanchez became very upset, started shaking, and then pointed to a photograph of a man, Alfred Glover, and said, "That's the man that's been following me, the police are looking for him, I've never seen his picture before." On seeing this photograph of her alleged stalker, Sanchez began to cry. Detective Ross, "totally confused" by her selection and the related stalker comment, covered up Glover's photograph and asked her to make another selection. At this point, he testified, Sanchez was "very anxious" and "appeared to be very frightened." Sanchez again reviewed the photographic array for a few minutes, pointed to a photograph of an individual other than the defendant and said, "I think that may be the person."[6] After the selection, Sanchez put her head down, started crying, and "start[ed] to lose her composure completely." No markings were made on the photograph to indicate her selection.[7] As discussed below, the parties have attributed her selection of someone other than the defendant to different causes.

After the misidentification, Sanchez was reunited with her

---

[6]Her husband had pointed to the same photograph during his photographic identification session on October 3, 1993.

[7]When asked why Sanchez's identification of the stalker was not signed, Detective Ross stated, "It was not an identification relative to this investigation." Similarly, her other identification was not signed because Sanchez's qualification, "I think that may be the person" did not constitute a positive identification.

husband and Detectives Acerra and Robinson. At this point, according to her testimony, Sanchez told her husband that she deliberately chose "the wrong guy," i.e., someone other than the defendant. Her husband informed Detective Robinson, who, after about five or ten minutes, brought Sanchez back to the photo identification room. She was no longer crying and, according to Detective Ross, "seemed relatively normal" and "pretty much in control." The police tape recorded Sanchez's second identification. Detective Ross first presented the Patterson array, but Sanchez pushed it away. When presented with the defendant's array, she immediately picked out the defendant and said, "That's him right there, that's the man that I saw crouching down by the car." Sanchez signed her name to the back of the photograph. Cf. note 7, *supra.* Approximately two weeks later, Sanchez identified the defendant in a police lineup.[8]

In January, 1995, the defendant submitted an offer of proof intending to show that Sanchez's earlier descriptions of her alleged stalker differed dramatically from the picture of Glover contained in the photographic array. Specifically, the defendant sought to present evidence contained in contemporaneous police reports (dated April and July, 1992, respectively), in which Sanchez described the stalker as being approximately six feet tall and slim, with a scar on his right hand. An affidavit from defense counsel indicated that Glover was five feet four inches, heavy set, and had no scar on either hand. This offer of proof was renewed prior to the third trial. At the third trial, both photographic arrays were admitted in evidence and Sanchez's identifications were the subject of extensive cross-examination. The defendant discredited Sanchez's testimony by eliciting the following: Sanchez was not "paying much attention" when she left the Walgreens, Detective Acerra was "a good friend" of Sanchez's mother, and that Sanchez "point[ed] out a different person that was stalking [her]" at the suppression hearing. Defense counsel invited the jury to compare the defendant's photograph with the one that Sanchez initially had selected ("the wrong guy"). Over his objection, the defendant was not permitted to inquire further about the stalker or any related description of his appearance.

On appeal, the defendant contends that he should have been permitted (1) to have Glover appear before the jury and (2) to

[8]In September, 1994, the defendant moved to suppress Sanchez's photographic identification. The suppression judge denied the motion.

question police officers about Sanchez's earlier descriptions of the stalker so the jury could contrast those descriptions with Glover's photograph in the array. The defendant asserts this evidence should have been admitted for two reasons. First, he argues, it would refute the Commonwealth's explanation of Sanchez's misidentification, i.e., that it was a deliberate outgrowth of her fear and agitation. This evidence, he says, would bolster his theory that the stalker story was a "post hoc subterfuge" designed to explain why Sanchez did not select the defendant's photograph from the array on her first attempt. Second, he says, this evidence would suggest to the jury that Sanchez's capacity to perceive and remember people is not reliable. As a result, the defendant argues, the judge's refusal to allow this impeachment of a critical Commonwealth witness violated his constitutional right to confrontation and constituted reversible error.

For the purposes of testing a witness's accuracy, veracity, and credibility, it is settled that "the scope of cross-examination . . . rests largely in the sound discretion of the judge, not subject to revision unless prejudice is shown to a party by reason of too narrow restriction or too great breadth of inquiry." *Commonwealth* v. *Jackson*, 419 Mass. 716, 726 (1995), quoting *Commonwealth* v. *Repoza*, 382 Mass. 119, 125 (1980), *S.C.*, 400 Mass. 516, cert. denied, 484 U.S. 935 (1987). *Commonwealth* v. *Carrion*, 407 Mass. 263, 273 (1990) (extent of impeachment of witness's credibility and competency well within judge's discretion).

Where there is a risk of confusing the jury, the judge must weigh the probative value of any proffered evidence against such danger. *Commonwealth* v. *Rosa*, 422 Mass. 18, 25 (1996). In these circumstances, the judge did not abuse his discretion: permitting the jury to compare Glover's actual appearance with Sanchez's description had limited probative value. When she examined the photographic array, Sanchez was asked to make an identification from a photograph depicting the defendant's head and facial features from among photographs of other black male faces. Allowing the jury to contrast Sanchez's recollection of her stalker's height and nonfacial scars — characteristics not observable in any of the photographs in the array — would not help the jury in their task. Moreover, we give broad discretion to trial judges who have valid concerns about trying a case within a case. *Commonwealth* v. *Franklin*, 366 Mass. 284, 289

(1974). By permitting inquiry into a wholly unrelated matter, the judge risked distracting the jury. The judge's refusal to permit the defendant to bring Glover before the jury was well within his discretion.

In reviewing the judge's decision regarding Sanchez's prior descriptions of the stalker, we consider, in turn, the defendant's theories of admissibility. His first theory addresses why Sanchez initially identified a photograph other than the defendant's. Sanchez testified that she deliberately picked the wrong photograph because she "didn't want to get involved" and because she was "scared." The Commonwealth presented other evidence that Sanchez was "petrified [and] afraid that if she had picked him out, he was going to come back and get her." And Detective Ross attributed her misidentification to her agitated state after having seen a photograph of her stalker. The defendant counters that he should have been permitted to demonstrate that Sanchez's misidentification was neither deliberate nor motivated by agitation; rather, he should have been able to show the jury that she simply could not recall whom she had seen on the night of the murder. Thus, the defendant argues, that the descriptions of her stalker she originally gave to the police are admissible to show that any explanations for Sanchez's failure to select the defendant were after-the-fact attempts to bolster the credibility of the Commonwealth's sole eyewitness. His argument is not persuasive.

At the outset, we note that Sanchez was subject to rigorous cross-examination. Defense counsel established that Sanchez had identified two different photographs as her stalker (one at the police station, another at the suppression hearing). During closing arguments, the defendant focused the jury on Sanchez's credibility, suggesting that her "prior inconsistent statements are evidence . . . of lack of believability" and reminding them of the "bizarre thing about the stalker." He asked the jury, "Is this a person that you are going to rely on in the most serious case that the Commonwealth can have? . . . Would you rely on this teenager?" It is clear that the defendant had ample opportunity to impeach Sanchez.

Second, even if the defendant had refuted the stalker explanation, a jury could have found the Commonwealth's other explanation for Sanchez's initial misidentification, i.e., Sanchez's fear of becoming involved in a murder investigation, entirely reasonable. A combination of factors including her

mother's advice not to get involved, the witness's age (eighteen years old), and the fact that she had been a victim of a criminal assault in the past, explain why Sanchez might be motivated to select intentionally the photograph of "the wrong guy." Detective Ross testified that Sanchez asked him, "If he killed a cop, why wouldn't he kill me?," revealing to the jury her uneasy state of mind at the time of the photographic identification. Because the jury could reasonably infer that fear of retaliation, rather than fear engendered by seeing a photograph of her stalker in the array, was the reason for Sanchez's misidentification, any error on the part of the judge not to admit the proffered evidence was harmless beyond a reasonable doubt. *Commonwealth* v. *Peixoto*, 430 Mass. 654, 654-655 (2000).

Alternatively, the defendant argues that inquiry into the conditions under which Sanchez saw and described her stalker were relevant to demonstrate the witness's flawed capacity to perceive and remember. "While defendants are entitled to reasonable latitude on cross-examination, the scope of such cross-examination, including the extent of impeachment of a witness for credibility and competency, are well within the judge's sound discretion." *Commonwealth* v. *Carrion*, 407 Mass. 263, 273 (1990), and cases cited. As his effective cross-examination bears out, the defendant was provided "reasonable latitude" to challenge Sanchez's ability to perceive and remember in the circumstances of the case, and the judge acted within his discretion in limiting the impeachment of Sanchez. *Id.*

The defendant's reliance on *Commonwealth* v. *Franklin*, 366 Mass. 284 (1974), is misplaced. In that case, the victims initially identified two of their assailants but, on the eve of trial, acknowledged they were mistaken in regard to one of the identifications. *Id.* at 286-287. Because evidence of the mistaken identification was excluded, this court reversed the convictions and granted a new trial. *Id.* at 290. In reaching its conclusion, the majority cautioned, "[w]e have no intention here of setting new and restrictive perimeters to the trial judge's usual discretionary control over the limits of cross-examination. Rather, we have concluded that the *special circumstances* of [these cases] required greater latitude than the judge permitted" (emphasis added). *Id.* at 290-291. Those "special circumstances" included the fact that (a) the misidentification arose from the exact same incident as the one being prosecuted and (b) evidence of the misidentification was excluded entirely. *Id.*

at 289-290. See Commonwealth v. *Pettijohn,* 373 Mass. 26, 30-32 (1977) (emphasizing that *Franklin* case was based on "the special circumstances of that case"). Considering that Sanchez's stalker identification stems from a wholly different event and evidence of Sanchez's misidentification was already before the jury, no such "special circumstances" are present here.

3. *Specific Unanimity Instructions.*

The defendant argues that the jury should have been required to specify whether they convicted the defendant as a principal or as a joint venturer. We previously have not indorsed such a requirement and decline to do so here.

"It is beyond dispute that the jury verdict in a criminal trial . . . must be unanimous." *Commonwealth* v. *Berry,* 420 Mass. 95, 111 (1995), quoting *Commonwealth* v. *Hebert,* 379 Mass. 752, 754 (1980). Where the defendant is charged with murder in the first degree the required unanimity extends only to the theory of culpability. *Commonwealth* v. *Berry, supra* at 112. As we have made clear, the jury are not required to conclude unanimously that the defendant was either the principal or the joint venturer, so long as sufficient evidence exists to support either role. See *Commonwealth* v. *Pike,* 431 Mass. 212, 214-215 (2000); *Commonwealth* v. *Souza,* 428 Mass. 478, 488-489 (1998); *Commonwealth* v. *Nolan,* 427 Mass. 541, 544 (1998); *Commonwealth* v. *Brooks,* 422 Mass. 574, 576-577 (1996). Furthermore, direct evidence of who actually shot the victim is not required where, as here, there is sufficient evidence that one of the assailants (the defendant or Patterson) committed the fatal act. *Commonwealth* v. *Pike, supra* at 215. *Commonwealth* v. *Chipman,* 418 Mass. 262, 268 (1994). *Commonwealth* v. *Cohen,* 412 Mass. 375, 381 (1992). In proving the defendant's guilt beyond a reasonable doubt, it is not necessary for the Commonwealth to exclude the possibility that Patterson fired the shots. *Commonwealth* v. *Cohen, supra* at 380-381.

The evidence here — the presence of both the defendant and Patterson at the crime scene, the eyewitness who observed the defendant crouching next to the victim's car, Patterson's fingerprints on the victim's car and the defendant's possession of the murder weapon and the victim's service weapon — justified the submission of the case to the jury on the theories that the defendant was either the principal or a joint venturer in the killing. There was no error, let alone a substantial miscarriage

of justice. *Commonwealth* v. *Echavarria*, 428 Mass. 593, 598 & n.3 (1998) ("exemplary" joint venture instructions stated, "Commonwealth need not . . . prove beyond a reasonable doubt which perpetrator was the principal and which was the abettor").

4. *Sufficiency of the Evidence.*

The defendant claims that a finding of joint venture felony-murder was not warranted absent direct evidence that the defendant knew his codefendant was armed. To be convicted on a theory of joint venture for a crime that has possession of a weapon has one of its elements, the joint venturer must be shown to have had knowledge that the principal perpetrator had a weapon. *Commonwealth* v. *Fickett*, 403 Mass. 194, 196-197 (1988). The defendant moved for required findings of not guilty thereby preserving the issue for appellate review. *Id.* at 197. In reviewing "a judge's denial of a defendant's motion for a required finding of not guilty, we inquire whether the evidence, considered in the light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Coonan*, 428 Mass. 823, 828 (1999), and cases cited. The absence of direct evidence in the record is not determinative, because knowledge that a joint venturer is armed may be inferred from circumstantial evidence. *Commonwealth* v. *Kilburn*, 426 Mass. 31, 35 n.7 (1997), and cases cited. Where the evidence is circumstantial, "it is not essential that the inferences drawn should be the only necessary inferences . . . . It is enough that [the inferences] be reasonable and possible." *Commonwealth* v. *Pike*, 430 Mass. 317, 321 (1999), quoting *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992).

Employing this standard, we conclude that there was sufficient evidence from which a jury could infer that the defendant was aware that his codefendant was armed. Such an inference is bolstered by the evidence that the defendant retained possession of both the murder weapon and the officer's weapon. *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 547 (1990) (where, among other evidence, defendant apprehended in possession of four weapons, jury could infer defendant knew codefendants were armed). Furthermore, there was evidence that at least one goal of the joint venture was to steal the gun of the victim, a police officer. We agree with the Commonwealth that the defendant would not have engaged in this extremely dangerous

pursuit unless either he or Patterson was armed. See *Commonwealth* v. *Ferguson*, 365 Mass. 1, 9 (1974) (from "apprehen-[sion] that the intended victim might resist," jury could infer that the defendant in planned robbery knew that other participants were armed). Thus, the jury could reasonably conclude that, at the time of the criminal act, the defendant personally possessed the murder weapon or knew that Patterson did.

5. *Extreme Atrocity and Cruelty*: Cunneen *Factors.*

The defendant contends that the judge's instruction on extreme atrocity or cruelty was unconstitutionally broad because he invited the jury to consider factors beyond those delineated in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), in violation of our rule in *Commonwealth* v. *Hunter*, 416 Mass. 831, 836-837 (1994), *S.C.*, 427 Mass. 651 (1998), where we said that the jury's consideration must be limited to those factors.[9] We need not consider the propriety of the judge's extreme atrocity or cruelty instruction where, as here, the jury rationally concluded that the defendant was guilty of felony-murder. *Commonwealth* v. *Chipman*, 418 Mass. 262, 270 n.5 (1994) ("Because the jurors were warranted in determining that the murder was committed with deliberate premeditation, we need not address the question whether the jurors were also warranted in determining that the murder was committed with extreme atrocity or cruelty").

Although our prior decisions make it unnecessary, we briefly respond to the defendant's claim. The judge instructed the jury that the relevant factors "include, but are not limited to" the *Cunneen* factors and that "extreme atrocity or cruelty is not limited to cases with such evidence." He added that "[t]he jury must determine that one or more of such factors has been proven beyond a reasonable doubt before the defendant may be convicted of murder in the first degree on a theory of extreme atrocity or cruelty." Although the defendant objected to the "giving of any instruction on the theory of extreme atrocity or cruelty," he did not alert the judge to any misstatements regarding the *Cunneen* factors. The defendant therefore failed to preserve this issue.

---

[9]The factors delineated in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), are: "indifference to or taking pleasure in the victim's suffering, consciousness and degree of suffering of the victim, extent of physical injuries, number of blows, manner and force with which delivered, instrument employed, and disproportion between the means needed to cause death and those employed."

Failure to apply the rule explained in *Commonwealth* v. *Hunter, supra,* would not give rise to a substantial likelihood of a miscarriage of justice if the jury's verdict could readily depend on a factor articulated in the *Cunneen* case. *Commonwealth* v. *Blackwell,* 422 Mass. 294, 299 (1996). The five gunshot wounds to the victim's head at close range satisfies both the multiple blows and the disproportionality factors. *Commonwealth* v. *James,* 427 Mass. 312, 313-314 (1998) (three blows, each of which would have been fatal shows disproportion between the means needed to cause death and those employed). In light of this evidence, there is no substantial likelihood that the jury did not base their verdict on at least one of the *Cunneen* factors.[10] *Commonwealth* v. *Jenner,* 426 Mass. 163, 166 n.4 (1997) (no substantial likelihood of miscarriage of justice where jury instructed they "are not limited to" the *Cunneen* factors).

6. *Denial of the Defendant's Motion for a New Trial.*

The defendant argues that the judge erred in denying his motion for a new trial and his motion for reconsideration of his motion to suppress identification.[11] The defendant contends that newly discovered evidence cast enough doubt on the integrity of the police investigatory procedures leading up to the Sanchez identification to necessitate a new trial and a new hearing on his motion to suppress. The newly discovered evidence concerned corrupt police practices on the part of Detectives Walter Robinson, Kenneth Acerra, and John Brazil. We consider whether the judge's denial of these motions was in error.

In March and October of 1997, indictments were returned by a Federal grand jury against Acerra and Robinson alleging, inter alia, the submission of false search warrant applications and affidavits and the illegal seizure of property and funds pursuant to those warrants.[12] On March 6, 1998, Acerra and Robinson pleaded guilty to fourteen counts of criminal conduct and were later sentenced to three years' imprisonment and restitution of $100,000 each. As noted above, Acerra, Robinson, and Brazil

---

[10]That the victim may have been sleeping, and thus might not have endured any conscious suffering, does not affect our conclusion. *Commonwealth* v. *Podlaski,* 377 Mass. 339, 348 (1979) ("suffering has never been an indispensable element of the crime of murder with extreme atrocity or cruelty").

[11]The judge decided the defendant's motions without an evidentiary hearing.

[12]Brazil was neither charged nor convicted of wrongdoing but, after being granted immunity, admitted his involvement in the wrongdoing and testified before the Federal grand jury and at a trial of a codefendant of Robinson and Acerra.

were each directly involved in the investigation and prosecution of the defendant, especially with regard to the photographic identification procedures. At trial, Brazil testified to the circumstances and content of the defendant's statement to the police; neither Acerra nor Robinson testified at trial. Acerra and Robinson did testify, however, at the suppression hearing. It is the defendant's position that evidence of their misconduct in other investigations should be admissible (1) to impeach their credibility concerning the photographic array, and (2) to suggest that Sanchez's identification of the defendant's photograph was the product of corrupt police tactics, and that a new trial is required for this purpose.

"Where a defendant alleges that witness identifications arise from unnecessarily suggestive circumstances, the 'defendant has the burden to prove, by a preponderance of the evidence, that the witness was subjected by the State to a pretrial confrontation . . . "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny the defendant due process of law.' " Commonwealth v. Odware, 429 Mass. 231, 235 (1999), quoting Commonwealth v. Otsuki, 411 Mass. 218, 232 (1991). Whether an identification rises to the level of "unnecessarily suggestive," is to be gleaned from "the totality of the circumstances attending the confrontation." Commonwealth v. Odware, supra, quoting Commonwealth v. Otsuki, supra. On the record before us, the defendant has not met his burden. Given the absence of evidence, by affidavit or otherwise, suggesting that the subject detectives procured false evidence in connection with the investigation of this defendant, we cannot say that the witness was subjected to an unnecessarily suggestive confrontation. Accordingly, it was not erroneous for the judge to deny the motion. Commonwealth v. Campiti, 41 Mass. App. Ct. 43, 62-66 (1996) (no error to deny motion for new trial based on evidence of unrelated police misconduct). See Commonwealth v. Ramirez, 416 Mass. 41, 47 (1993), quoting Commonwealth v. Toney, 385 Mass. 575, 581 (1982) ("[i]t is well established that '[n]ewly discovered evidence that tends merely to impeach the credibility of a witness will not ordinarily be the basis of a new trial' ").

7. Section 33E Review.

Pursuant to our duties under G. L. c. 278, § 33E, we have reviewed the entire record. We find nothing that compels

us to exercise our discretion to disturb the jury's verdict, either by reducing the verdict or granting a new trial.

*Judgments affirmed.*

*Order denying motion for a new
trial affirmed.*