## COMMONWEALTH vs. DAVID PHIM.

Middlesex. February 7, 2012. - June 14, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Firearms. Accessory and Principal. Constitutional Law,* Double jeopardy, Confrontation of witnesses. *Practice, Criminal,* Double jeopardy, Instructions to jury, Confrontation of witnesses, Hearsay, Jury and jurors. *Evidence,* Prior misconduct, Relevancy and materiality, Motive, Expert opinion, Hearsay. *Witness,* Expert. *Jury and Jurors.*

At the retrial of indictments charging murder and related firearms charges, constitutional protections against double jeopardy did not preclude the giving of an instruction on accessory liability that had not been given in the first trial, where, given that there was no evidence of bad faith by the judge or prosecutor at the first trial, the judge in the subsequent trial was not bound to repeat the mistakes and omissions made in instructing the jury at the first trial. [473-476]

The judge at a murder trial did not abuse his discretion in admitting in evidence testimony that the defendant was a member of a gang, that his girl friend's brother was a member of a rival gang, and that several people at the scene of the shooting (including the victim) were also members of that rival gang, where evidence of the antagonistic relationship between the two gangs was relevant to show motive; where the judge had limited any prejudicial effect of the evidence by asking members of the venire at voir dire whether evidence of gang membership would affect their impartiality; and where the judge provided strong limiting instructions to the jury, reminding them of their oaths and their answers at voir dire. [476-478]

At a murder trial, no substantial risk of a miscarriage of justice arose from the testimony of a medical examiner who had not conducted the autopsy, where, although the substitute medical examiner should not have testified on direct examination to the facts in the autopsy report, the hearsay in the substitute medical examiner's testimony had no bearing on whether the defendant in fact participated in the shooting. [478-480]

The judge at a criminal trial did not abuse his discretion in declining to excuse a juror who had a prior acquaintance with a witness, where the juror's indistinct recollection that, more than a decade earlier, the witness likely had been one of the juror's many students did not establish probable bias. [480-481]

INDICTMENTS found and returned in the Superior Court Department on June 28, 2007.

The cases were tried before *S. Jane Haggerty,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Aziz Safar* for the defendant.

*Anne Pogue Donohue*, Assistant District Attorney, for the Commonwealth.

LENK, J. The defendant appeals from his convictions of murder in the second degree and related firearms charges. The defendant was convicted on retrial; the jury at his first trial were unable to agree on a unanimous verdict. The defendant contends, among other things, that State and Federal double jeopardy protections precluded the judge at the second trial from instructing the jury on accessory liability where no such instruction was provided to the first jury. We conclude that the instruction given at the second trial was appropriate, because it would have been supported by the evidence introduced at the first trial, and, in the circumstances of this case, did not invite the jury to convict on a theory of the crime abandoned or foreclosed by the Commonwealth at the first trial. We discern no other error that would warrant relief, and therefore affirm.

1. *Background.* We briefly recite the facts the jury could have found at the second trial,[1] reserving certain additional facts for later discussion.

On the evening of April 7, 2007, several bullets were fired into a window at 168 Fletcher Street in Lowell. One of those bullets hit Vuthavy Phay, a guest at a party being held at that house. Phay died from his injuries. At the time of the shooting, the defendant was in a dating relationship with a resident of 168 Fletcher Street, Jennifer Chhea.[2] Jennifer lived there with her parents and siblings. The eldest of her siblings, her brother John, was a member of the "Asian Boyz" gang. The defendant was a member of a rival gang, "TRG Grey."

The jury reasonably could have inferred that these rival gang affiliations were a source of tension between John and the

---

[1] The parties did not submit a complete transcript of the first trial. The defendant does not contend, however, that the evidence presented at the first trial was substantially different from the evidence presented at the second trial.

[2] Because they share a last name, we will refer to siblings Jennifer and Bunthorng Chhea by their first names. We will refer also to their elder brother, John Sieng, by his first name.

defendant. The jury heard testimony that John, as well as other family members, disapproved of Jennifer's relationship with the defendant, and would not allow the defendant into their house. In her testimony, Jennifer suggested also that when John learned the defendant had been in their house, he threatened the defendant with physical harm.

Less than a week before the murder, Jennifer told the defendant that she had engaged in sexual relations with another man. On April 7, the day of the shooting, Jennifer told him that she was pregnant. The defendant reacted angrily, throwing her on the bed and punching her.

Later the same day, the defendant met with his friend Roth Em, who had also previously dated Jennifer. Em had recently quarreled with Jennifer, expressing his disdain for her brother John's gang. At trial, Em testified that, on April 7, he, the defendant, and two other men had gone together to Fletcher Street. Em stated that he and the defendant walked up an alley behind 168 Fletcher Street. From the alley, the defendant shot several rounds into one of the building's windows.

If not himself the shooter, Em was the only percipient witness to the shooting. Jennifer's middle brother, Bunthorng, testified that he saw the defendant with a gun outside the building immediately after the shooting.[3] However, Bunthorng heard, but did not see, the shots being fired, and therefore could not testify to whether it was Em or the defendant who had fired the gun.

On June 28, 2007, a grand jury returned indictments charging the defendant with murder in the first degree, possession of a firearm, possession of a loaded firearm, and possession of ammunition. The defendant's first trial began before a Superior Court jury on March 10, 2009, and terminated on March 24, when the trial judge declared a mistrial after receiving two notes from the jury declaring that they were "hopelessly" and "truly" deadlocked. The defendant's retrial before a second jury commenced on August 11, 2009, with a different judge presiding. This jury convicted him of murder in the second degree, and also of each of the firearms charges. We granted the defendant's application for direct appellate review.

---

[3]Bunthorng also testified at trial that he had, under oath, initially identified Em as being in possession of the gun.

2. *Discussion.* The defendant's primary claim on appeal concerns the variance between the instructions to the two juries. He contends that the additional instruction on accessory liability given to the second jury, which he characterizes as explaining a theory of guilt withheld from the first jury, violated State and Federal protections against double jeopardy. As explained in part 2.a, *infra*, the defendant's argument misconceives the relationship between accessory and principal liability and is therefore unavailing.

The defendant argues also that the judge improperly admitted evidence of his gang affiliation, that certain testimony by a substitute medical examiner violated the right to confront the witnesses against him under the Sixth Amendment to the United States Constitution, and that the foreperson had an impermissible personal connection with a prosecution witness. We discern no error in the admission in evidence of gang affiliation or in the selection of the jury. Further, while certain portions of the substitute medical examiner's testimony were improperly admitted, the testimony did not create a substantial risk of a miscarriage of justice.

a. *Double jeopardy.* The Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." This language, and parallel Massachusetts statutory and common law, generally preclude the Commonwealth from trying a defendant more than once for the same offense. See G. L. c. 263, § 7; *Commonwealth* v. *Cassidy*, 410 Mass. 174, 176 (1991). However, an exception to this rule is made where a prior trial terminated in a mistrial due to "manifest necessity." *Illinois* v. *Somerville*, 410 U.S. 458, 461 (1973), quoting *United States* v. *Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824).

The trial judge's belief that the jury is unable to reach a verdict "has long been considered the 'classic basis' for a proper mistrial." *Blueford* v. *Arkansas*, 132 S. Ct. 2044, 2047 (2012), quoting *Arizona* v. *Washington*, 434 U.S. 497, 509 (1978). So long as the Commonwealth "presents evidence legally sufficient to convict" at the first trial, double jeopardy will not generally "bar retrial after a mistrial [is] declared because of a 'hung jury.' " *Berry* v. *Commonwealth*, 393 Mass. 793, 794,

798-799 (1985), citing *Thames* v. *Commonwealth*, 365 Mass. 477, 479 (1974). Unless there is evidence of bad faith by the judge or the prosecutor, retrial is appropriate even where jury deadlock may have resulted from judicial errors or omissions. See *Choy* v. *Commonwealth*, 456 Mass. 146, 152, cert. denied, 131 S. Ct. 425 (2010); *Commonwealth* v. *Ellis*, 432 Mass. 746, 752 (2000) (even if judge's failure to give joint venture instruction to deadlocked jury had been error, such error would not have precluded retrial absent showing of bad faith). At a subsequent trial, the judge is not bound to repeat the mistakes and omissions made in instructing the jury at the first trial. See *Choy* v. *Commonwealth*, *supra* at 153; *Commonwealth* v. *Ellis*, *supra*. See also *United States* v. *Lorenzo*, 570 F.2d 294, 299 (9th Cir. 1978) (declaration of mistrial rendered harmless any errors in jury instructions at first trial).

The present case falls squarely within these principles. At the defendant's first trial, the judge instructed the jury on the elements of each offense without informing them that the defendant could be convicted of murder as a joint venturer regardless whether he physically possessed the firearm and personally pulled the trigger.[4,5] The defendant recognizes that the Commonwealth was entitled to a broader instruction, but points out that the Commonwealth did not object to the judge's omission.

On August 3, 2009, eight days before the defendant's retrial commenced, we issued our decision in *Commonwealth* v. *Zanetti*, 454 Mass. 449 (2009) (*Zanetti*). In that case, we observed

---

[4]Prior to *Commonwealth* v. *Zanetti*, 454 Mass. 449, 466 (2009), "the so-called model jury instructions encourage[d] judges to instruct on the required elements of the charged offense, and then separately instruct on joint venture liability . . . as if the required elements of the charged offense appl[ied] only to prove principal liability and the joint venture elements appl[ied] only to prove joint venture liability." As we noted, even where the complete instruction is given, "[t]his separate narration of the elements may be confusing to jurors, who should understand that, to find the defendant guilty as a joint venturer, they must find that the Commonwealth has proved both the elements of the offense and the defendant's knowing participation in the offense." *Id.*

[5]Because Bunthorng did not see the shots actually being fired, the only testimony that the defendant, rather than Em, fired the shots came from Em himself. Further, both juries heard testimony from Bunthorng that he had, under oath, initially identified Em as the one he saw carrying the gun. Had the first jury been aware that they need not be unanimous on whether Em or the defendant fired the gun, see *infra*, they might have convicted the defendant.

that our prior decisions had "renounce[d] the false distinction between a principal and an accomplice," and had "recognized that the accomplice commits the crime no less than the principal." *Id.* at 464-465, and cases cited. We therefore explained that "judges are to instruct the jury that the defendant is guilty if the Commonwealth has proved beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged," *id.* at 467-468, regardless whether as principal or accomplice. The instructions given at the second trial accorded with *Zanetti, supra*; the judge in fact quoted verbatim from the jury instructions set forth in that case. See *id.* at 470 (Appendix). The defendant did not object to the jury charge.

Because the instructions at the first trial contained no reference to joint venture liability, the jury at that trial could have been left with the impression that, to find the defendant guilty of murder, they had to determine unanimously that he had personally fired the fatal shot. Any such impression would have been erroneous. See *id.* at 466, 468.

Notwithstanding the defendant's contentions, the Commonwealth's ability to retry the defendant does not depend on whether the first jury would have been deadlocked had they been given a complete instruction on the law of murder, one that made clear that the defendant's guilt did not depend on whether he personally had fired the gun. There is no allegation, and no evidence, suggesting that the judge's failure to provide an instruction on joint venture liability at the first trial was intended to precipitate a mistrial. See *Commonwealth v. Andrews*, 403 Mass. 441, 448 (1988) ("the burden is on the defendant[] to show judicial bad faith or prosecutorial 'goading' or 'overreaching' "). The judge at the second trial was not bound to repeat the omission made at the first trial. See *Commonwealth v. Ellis, supra* at 752 (rejecting "defendant's claim that a more pointed instruction would have avoided the deadlock"). See also *Burks v. United States*, 437 U.S. 1, 15 (1978); *United States v. Jorn*, 400 U.S. 470, 485 (1971). The judge at the retrial correctly provided that jury with a complete instruction on the law of murder, including participation in a murder other than as a principal.

The defendant's reliance on *Saylor v. Cornelius*, 845 F.2d 1401, 1404 (6th Cir. 1988), is unavailing. In that case, the

defendant was tried on a charge of murder as an accomplice and on a conspiracy charge. The judge instructed only on the conspiracy charge, and the jury convicted, but the Kentucky Supreme Court reversed the conviction because of insufficient evidence. The Kentucky Supreme Court subsequently determined that the defendant could be retried on the theory of accomplice liability. *Id.* at 1403. In granting the defendant's petition for a writ of habeas corpus, the United States Court of Appeals for the Sixth Circuit held that when the first trial terminated without the judge charging the jury on murder, the defendant was no longer in jeopardy of a conviction of any crime other than conspiracy. The defendant's jeopardy for murder, as an accomplice or otherwise, had therefore terminated. *Id.* at 1404.

The event that terminated jeopardy in *Saylor* v. *Cornelius*, *supra*, was the judge's failure to present one of the charged crimes to the jury. That case simply does not extend to situations where a charged crime is presented to the jury, thus continuing the defendant's jeopardy, but the jury deadlock on whether to convict.

Nor can the prosecutor's acquiescence to the instructions provided at the first trial be construed either as an election to try the case on a principal rather than a joint venture theory of liability, or as abandonment of a joint venture theory. Contrast *State* v. *Quitog*, 85 Haw. 128, 146, 148-149 (1997) (prosecutor expressly urged jury in closing argument to convict defendant not on crime charged but instead on lesser included offenses). Liability as a principal and liability as an accomplice are not distinct theories of liability for the jury or the prosecutor to choose between. See *Zanetti*, *supra* at 468. As a result, the considerable reliance placed by the defendant on *Choy* v. *Commonwealth*, 456 Mass. 146, 155-160 (2010) (Cowin, J., dissenting), is misplaced. Double jeopardy protections do not preclude the instruction given at the second trial.

b. *Evidence of gang affiliation.* The Commonwealth introduced evidence, over objection, that the defendant was a member of a gang; that his girl friend Jennifer's brother, John, was a member of a rival gang; and that several people at the scene of the shooting, including the victim, were also members of that

rival gang. There was evidence also that Em, the defendant's alleged accomplice, had argued with Jennifer over her brother's gang affiliation.

We have recognized repeatedly that evidence of a defendant's gang membership risks prejudice to the defendant in that it may suggest a propensity to criminality or violence. See, e.g., *Commonwealth* v. *Swafford*, 441 Mass. 329, 333 (2004). Nevertheless, "gang affiliation evidence is admissible to show motive." *Commonwealth* v. *John*, 442 Mass. 329, 337 (2004). Such evidence may be relevant also to prove joint venture. *Commonwealth* v. *Swafford, supra* at 332-333. "[I]t is within the discretion of the judge to weigh the probative value of [gang affiliation] evidence against its prejudicial effect." *Id.* at 332, quoting *Commonwealth* v. *Correa*, 437 Mass. 197, 201 (2002).

In the present case, evidence of the antagonistic relationship between the two gangs was relevant to show motive. Although the defendant's anger at Jennifer could be explained without reference to gang affiliation, that his gang affiliation was not the only possible motive does not require exclusion of the gang evidence. "The prosecutor is 'entitled to present as full a picture as possible of the events surrounding the incident itself.' " *Commonwealth* v. *Weeks*, 77 Mass. App. Ct. 1, 10 (2010), quoting *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 269-270 (1982). Without the evidence that John, who was opposed to his sister's relationship with the defendant, was a member of a rival gang, and that members of that gang were gathered at Jennifer's residence, the jury would have been left to speculate as to why the defendant fired into a crowded residence rather than targeting Jennifer specifically. Further, because there was testimony suggesting that Em sympathized with the defendant's gang, evidence of the defendant's gang affiliation was relevant to whether Em and the defendant were acting in concert, and thus to the defendant's potential joint venture liability.[6] See *Commonwealth* v. *Smiley*, 431 Mass. 477, 484 (2000).

In addition, the judge limited any prejudicial effect of the

---

[6]Em testified also that he feared that members of the Asian Boyz gang were "looking for [him]," and that he had communicated this information to the defendant, with whom he had a close relationship. His fear could have provided additional motive for the shooting.

evidence concerning the defendant's gang affiliation by asking members of the venire at voir dire whether evidence of gang membership would affect their impartiality, and by providing strong limiting instructions to the jury, reminding them of their oaths and their answers at voir dire. These curative actions closely resembled those that we have described with approval in other cases. See, e.g., *Commonwealth* v. *Correa, supra*; *Commonwealth* v. *Maldonado*, 429 Mass. 502, 505 (1999). In the circumstances of this case, and in light of the measures adopted by the judge to limit the risk of prejudice, we cannot conclude that the admission of limited testimony on gang affiliation constituted an abuse of discretion.

c. *Substitute medical examiner.* The medical examiner who testified at trial to the victim's cause of death had not conducted the autopsy. Instead, he relied on an autopsy report prepared by another medical examiner. The substitute examiner opined that, based on his review of the first examiner's file, his opinion was that the cause of death was a gunshot wound to the head. He testified also to certain details of the wound as described in the autopsy report and to the victim's physical characteristics. The Commonwealth concedes that the substitute examiner was without personal knowledge of these facts.

The defendant did not object to any of the substitute examiner's testimony, and we therefore review for a substantial risk of a miscarriage of justice,[7] notwithstanding the constitutional dimension of his claim. See *Commonwealth* v. *Vasquez*, 456 Mass. 350, 356 (2010). Under this standard, we will accord the defendant relief only "if we have a serious doubt whether the result of the trial might have been different had the error[s] not been made." *Commonwealth* v. *Russell*, 439 Mass. 340, 345 (2003), quoting *Commonwealth* v. *LeFave*, 430 Mass. 169, 174 (1999).

---

[7]We are cognizant that the defendant describes his trial counsel's failure to object to the medical examiner's hearsay as ineffective assistance of counsel. "[W]hen the claim of ineffectiveness is predicated . . . on counsel's failure to object to something that occurred at trial, the standard for evaluating the ineffectiveness claim is not significantly different from [that] applicable to our review of the underlying, unpreserved error"; we review the claim under the substantial risk standard applicable to such unpreserved error. See *Commonwealth* v. *Munoz*, 461 Mass 126, 141 n.20 (2011), quoting *Commonwealth* v. *Azar*, 435 Mass. 675, 686 (2002).

A medical examiner who did not personally perform an autopsy on the victim may properly testify as to his or her professional opinion concerning the victim's cause of death based on data collected by another medical examiner, so long as that data are independently admissible. *Commonwealth* v. *Nardi*, 452 Mass. 379, 388 (2008). Thus, the substitute examiner could properly state his independent opinion as to the likely cause of death. See *Commonwealth* v. *Munoz*, 461 Mass. 126, 132 (2011), citing *Bullcoming* v. *New Mexico*, 131 S. Ct. 2705, 2722 (2011) (Sotomayor, J., concurring in part).

Consistent with the Sixth Amendment and traditional protections against hearsay, however, a substitute medical examiner may not testify on direct examination to the facts, data, and conclusions stated in an autopsy report. *Commonwealth* v. *Nardi*, *supra* at 391 & n.13. The decision whether to elicit testimony from the report underlying the substitute examiner's testimony "is a strategic one left to the opposing party." *Id.*, quoting *Commonwealth* v. *Markvart*, 437 Mass. 331, 338 (2002). Accordingly, the prosecutor should not have elicited testimony on the description of the fatal wound contained in the nontestifying medical examiner's files, or of the victim's weight, height, and general physical condition.

We are confident, however, that this hearsay testimony did not result in a substantial risk of a miscarriage of justice. The substitute examiner's testimony was relevant only to establishing the cause of death; his opinion testimony as to the cause of death was properly admitted. The hearsay testimony had no bearing on the key issue at trial, whether the defendant in fact participated in the shooting.[8] We therefore discern no risk that the erroneously admitted testimony had more than a "very

---

[8]The cause of death, a gunshot wound to the head, was not a subject of dispute at trial. Nonetheless, the defendant's appellate brief suggests that, absent the substitute examiner's testimony, the defendant would have argued that the victim might have survived had he received prompt medical attention. There was no evidence of an undue or unusual delay in transporting the defendant to the hospital. We cannot discern how the brief time lapse between the shooting and the victim's arrival at the hospital would have assisted the defense. See *Commonwealth* v. *Fernette*, 398 Mass. 658, 668 (1986), quoting *Commonwealth* v. *Hackett*, 2 Allen 136, 142 (1861) ("if a person inflicts a wound with a deadly weapon in such manner as to put life in jeopardy, and death follows as a consequence of this felonious and wicked act, it does not

slight effect" on the jury, see *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983) (applying prejudicial error standard), let alone that it had a substantial influence upon the verdict.

d. *Juror partiality.* The defendant's final claim of error concerns a prior acquaintance between the jury foreperson and a State trooper who testified for the Commonwealth. The juror in question, juror no. 16, was a high school teacher and baseball coach. At the beginning of the fifth day of trial, he submitted a note to the judge stating that he was "familiar with" the trooper, who had testified on the fourth day. See note 9, *infra.* In his note, the juror explained that he had not recognized the trooper's name when the witness list was read to potential jurors, and had not seen the trooper for "many years (over 10)."

The judge consulted with the prosecutor and defense counsel on whether to excuse the juror. After speaking with the trooper, the prosecutor represented that juror no. 16 "may have been [the trooper's junior varsity] basketball coach, but it's over twenty years ago." The trooper suggested also that the juror had been his theology teacher.

In accordance with the procedure established in *Commonwealth* v. *Jackson*, 376 Mass. 790, 800-801 (1978), the judge conducted a colloquy with the juror. The juror stated again that he believed he had taught the trooper "many years ago," although he could not remember the capacity in which he had known the trooper. Not only was the juror's recollection of the trooper vague and indistinct, the juror stated explicitly that he remained able to evaluate and potentially reject the trooper's testimony.

"Whether to accept the declaration of a juror that he or she is disinterested lies within the broad discretion of the trial judge." *Commonwealth* v. *Stroyny*, 435 Mass. 635, 639 (2002). We have

alter its nature or diminish its criminality to prove that other causes cooperated in producing the fatal result").

In any event, the substitute examiner's ultimate opinion, that the nature of the defendant's wound "would make survival extremely unlikely," was not only elicited on cross-examination, but was also an ultimate opinion properly admissible even on direct examination. See *Commonwealth* v. *Nardi*, *supra* at 388.

only set aside such determinations in light of clear error, such as "solid evidence of a distinct bias." *Commonwealth* v. *Bryant*, 447 Mass. 494, 500 (2006), quoting *Commonwealth* v. *Leahy*, 445 Mass. 481, 499 (2005).

We discern no abuse of discretion in the judge's decision not to excuse juror no. 16. The juror's indistinct recollection that, more than a decade prior, a witness likely had been one of his many students, does not establish probable bias.[9] Contrast *Commonwealth* v. *McCowen*, 458 Mass. 461, 488 (2010) ("deliberating juror's child . . . awaited [felony] prosecution by the same district attorney's office prosecuting the defendant"). Accordingly, the tenuous prior acquaintance between the trooper and juror no. 16 did not require that the juror be excused.

*Judgments affirmed.*

---

[9]Indeed, the issue of juror no. 16's prior acquaintance with the testifying trooper came to the fore on the fifth day of trial. Subsequently, after deliberations had commenced, the juror initially selected as foreperson had to be excused. Defense counsel and the prosecutor jointly suggested that juror no. 16, then an alternate, take his place.