NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11993

COMMONWEALTH  vs.  SEAN K. ELLIS.


Suffolk.     May 5, 2016. - September 9, 2016.

Present:  Gants, C.J., Spina, Botsford, Duffly, & Hines, JJ.[1]



Practice, Criminal, New trial, Disclosure of evidence.
     Evidence, Exculpatory.  Estoppel.



     Indictments found and returned in the Superior Court
Department on October 27, 1993.

     Following review by this court, 432 Mass. 746 (2000), a
motion for a new trial, filed on March 13, 2013, was heard by
Carol S. Ball, J.

     A request for leave to appeal was allowed by Spina, J., in
the Supreme Judicial Court for the county of Suffolk.


     Paul B. Linn, Assistant District Attorney (Edmond J. Zabin,
Assistant District Attorney, with him) for the Commonwealth.
     Rosemary Curran Scapicchio (Jillise McDonough with her) for
the defendant.


---

     [1] Justices Spina and Duffly participated in the deliberation
on this case prior to their retirements.

GANTS, C.J.  On September 14, 1995, a Superior Court jury found the defendant guilty of murder in the first degree and armed robbery in the killing of Boston police Detective John Mulligan.  In 2000, we affirmed the defendant's convictions and the denial of his motion for a new trial.  Commonwealth v. Ellis, 432 Mass. 746, 765 (2000).  In 2013, the defendant filed a second motion for a new trial based on newly discovered evidence regarding the victim's participation in crimes of police corruption with several Boston police detectives who investigated his murder, and information provided to the police regarding possible third-party culprits.  A Superior Court judge allowed the new trial motion, concluding that the newly discovered evidence cast real doubt on the justice of his convictions.  We conclude that the judge did not abuse her discretion in ordering a new trial.

Background.  1.  Evidence at trial.  The convictions at issue in this case arose from the defendant's third trial.  At the first trial, the jury found the defendant guilty of the illegal possession of two firearms without a license, but were unable to render verdicts on the murder and armed robbery indictments, and a mistrial was declared as to those indictments.  The jury in the second trial were also unable to render verdicts on the murder and armed robbery indictments,

resulting again in a mistrial.  We recount the evidence presented at the defendant's third trial.

The victim had been a Boston police detective for seventeen years before his death.  In the early morning of September 26, 1993, he was working a paid security detail at a Walgreens pharmacy in the Roslindale section of Boston, a detail that he worked several times a week.

The defendant, after waiving the Miranda rights, told police that, at approximately 2:30 A.M., his cousin asked him to buy some diapers on his way home.  His friend, Terry Patterson, drove him and a woman to the Walgreens, where he purchased the diapers.[2]  He had earlier received a page from a friend, whom he telephoned from a public pay telephone outside the store at about 3:00 A.M.  According to the defendant, Patterson then drove the defendant and the woman to the defendant's apartment, where he spent the rest of the early morning.

At approximately 3:05 A.M., Rosa Sanchez arrived at the Walgreens with her husband to buy soap.  As she walked past the victim's vehicle, she noticed that the victim was asleep in his vehicle.  She also saw a man, whom she later identified as the

---

[2] There was evidence that a black male was seen in the diaper aisle of Walgreens at about 3:10 A.M. and that diapers were found at the defendant's apartment during a search conducted on October 1, 1993.

defendant, crouching by the victim's vehicle.  She entered the Walgreens and remained in the store for about twenty minutes.

Patterson owned a maroon or burgundy Volkswagen Rabbit vehicle with tinted windows, custom wheels, and a "bra" on the front.  At approximately 3:20 A.M., a newspaper deliverer was nearly struck by a vehicle matching that description as it was driven away from the Walgreens with two men in the front seat and a woman in the rear seat.  At about that same time, Victor Brown was awakened by a loud vehicle, and saw two African-American men, one tall, the other short and stocky,[3] standing near a brown Volkswagen Rabbit parked on the sidewalk with a woman sleeping in the rear seat.  The two men walked into a wooded area, reemerged from the woods, and walked down a footpath in the direction of the Walgreens, which was five minutes away on foot.  At approximately 3:35 A.M., Brown heard vehicle doors close and a vehicle engine start, and saw the brown vehicle drive away.   As Sanchez left the Walgreens at approximately 3:25 A.M., she saw the man she previously had seen crouching by the victim's vehicle standing with another man by a pay telephone near the vehicle.  At about this same time, another customer arrived at the Walgreens.  She spent a few minutes in the store, and, as she left, she saw two men fitting

---

[3] The defendant was tall and thin; Terry Patterson was short and stocky.

the descriptions of the defendant and Patterson walking toward the pay telephones. She noticed as she was entering and leaving the store that the victim appeared to be asleep in his vehicle with his seat reclined.

At 3:30 A.M., a Walgreens employee left the store during a break to get coffee, noticing as he left that the victim was in the victim's vehicle and appeared to be fine. The employee drove to get coffee at a shop that was about five minutes away. When he returned to the Walgreens several minutes later, he saw that the victim, who was still in the driver's seat of the vehicle with his seat reclined, had blood on his face. After unsuccessfully trying to rouse the victim, the employee ran into the store and told the manager to call the police. The 911 call was made at 3:49 A.M.

The victim had been shot five times in the face; each of the shots would have proved fatal. The front driver's side door of the victim's car was unlocked; the front passenger's side door was locked. The police officers who responded to the scene saw that the victim was wearing a holster for his service weapon, but the weapon was missing. Several of the individuals who were at the Walgreens that morning gave statements to police. Several witnesses recounted seeing two males whose descriptions were consistent with the defendant and Patterson in the area of the Walgreens between 3:00 and 3:30 A.M., but

Sanchez was the only witness who later identified either the defendant or Patterson.

Early in the morning of September 30, police located Patterson's vehicle. The vehicle no longer had a license plate, and the windows were no longer tinted; instead, they bore scratch marks and a glue-like residue, consistent with the tinting having been removed.

Under a grant of immunity, Letia Walker, the defendant's girl friend, testified that on the morning of September 30, she went with the defendant to his apartment.[4] The defendant entered the apartment, and returned with a bag. When they went to Walker's home, the defendant removed two guns from the bag, a nine-millimeter Glock pistol and a .25 caliber pistol with a "white" handle. The defendant then hid the guns under Walker's dresser. On October 1, Kurt Headen, a friend of the defendant, came to Walker's home. Walker and Headen removed the guns from under the dresser, and Walker touched the clip of the .25 caliber pistol. Headen took the guns and discarded them in a field by Walker's house.

On October 7, Boston police recruits found the two guns in that field. The Glock recovered from the field was the service

---

[4] On September 29, two cousins who lived with the defendant were murdered in his apartment. The jury did not learn of this killing. There is no evidence connecting their murder to the defendant.

weapon registered to the victim.  Forensic testing revealed that the .25 caliber pistol was the murder weapon.

On the evening of October 5, Sanchez was brought to the Boston police homicide unit with her husband by Detectives Walter Robinson and Kenneth Acerra to view photographic arrays. Detective Acerra knew Sanchez personally -- he lived with, and had a child by, Sanchez's aunt, and he was a good friend of Sanchez's mother.  Sanchez was shown two photographic arrays, one that contained a photograph of the defendant and another that contained a photograph of Patterson.  When she was first shown the array containing the defendant's photograph, Sanchez became upset and told the police that one of the people in the array had stalked her.[5]  The detectives who administered the array covered that photograph, and Sanchez looked at the remaining seven photographs.  She pointed to the photograph of someone other than the defendant, stating that she "[thought] that may be the person" she saw crouching by the victim's vehicle.[6]  She left the police station with her husband and

---

[5] At the motion to suppress the identification testimony, Rosa Sanchez was presented with the same photographic array and asked to point to the photograph of the person who had stalked her.  She selected a different photograph from the one she initially said was her stalker during the identification procedure that was conducted at the police station.

[6] Rosa Sanchez's husband, who drove her to the Walgreen's pharmacy on the morning of the killing, identified the same man when he was shown a photographic array a few days earlier.

Detectives Robinson and Acerra. Sanchez returned to the homicide unit minutes later, however, after she told her husband that she had intentionally selected the wrong person and her husband related that information to Detective Robinson. Sanchez testified that she picked the wrong person because she was afraid and did not want to get involved. When she returned to the homicide unit, she was shown the same photographic array and identified the photograph of the defendant as the person she had seen crouching by the victim's vehicle.[7] Sanchez later identified the defendant in an in-person lineup and made an in-court identification of the defendant.

A forensic fingerprint examiner testified to his opinion that a fingerprint, found on the clip of the murder weapon, was made by Walker. The same fingerprint examiner processed the victim's vehicle and found four latent prints on the driver's side door. The examiner testified that the four fingerprints were left simultaneously by different fingers of the same hand. The examiner identified the four fingerprints as belonging to Patterson and opined that the fingerprints were left by the act of closing the vehicle's door.[8]

---

[7] Sanchez did not identity anyone in the array containing the photograph of Patterson.

[8] Patterson was convicted of murder in the first degree, armed robbery, and possession of a dangerous weapon in a

The Commonwealth's theory of the case, as presented in closing argument, was that the defendant spotted the victim sleeping in his vehicle and saw the opportunity to steal a police officer's service weapon. The defendant and Patterson, it was argued, then drove to the side street near the Walgreens and left Patterson's vehicle there to avoid detection and facilitate their escape. They then walked back to the Walgreens and waited in the parking lot until no witnesses were present. When the parking lot was otherwise empty, "they" shot the victim, took his service weapon, ran back to Patterson's car, and drove away. Under the Commonwealth's theory, the motive for the murder was to take the victim's service weapon as a trophy.

The jury convicted the defendant of armed robbery and of murder in the first degree on theories of extreme atrocity or

---

separate trial, but his convictions were reversed on appeal and his case was remanded for a new trial. Commonwealth v. Patterson, 432 Mass. 767, 768, 781 (2000). On remand, Patterson moved in limine to bar the admission of the fingerprint identification, claiming that the identification opinion did not meet the reliability standards set forth in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590-595 (1993), and Commonwealth v. Lanigan, 419 Mass. 15, 25-26 (1994). Commonwealth v. Patterson, 445 Mass. 626, 627-628 (2005). The judge determined the fingerprint identification evidence to be admissible but reported the question, and we granted direct appellate review. Id. at 628. We held that it was an abuse of discretion to conclude that the identification opinion was admissible because the methodology used by the examiner to identify simultaneous latent fingerprint impressions was not reliable and thus not admissible. Id. at 639, 654-655. Patterson later pleaded guilty to the lesser included crime of manslaughter, and was sentenced to time served.

cruelty and felony-murder.  The judge denied the defendant's motion for a new trial, and on appeal we affirmed both the convictions and the denial of the motion for a new trial. Ellis, 432 Mass. at 747.  In that motion for a new trial, the defendant argued that newly discovered evidence concerning corrupt police practices committed by Detectives Robinson, Acerra, and Brazil "cast enough doubt on the integrity of the police investigatory procedures leading up to the Sanchez identification to necessitate a new trial and a new hearing on his motion to suppress."  Id. at 764.  We noted that in 1997, two years after the defendant's convictions at his third trial, a Federal grand jury returned indictments against Acerra and Robinson alleging, among other things, that they submitted false search warrant applications and affidavits and illegally seized property and funds obtained through the searches conducted pursuant to those warrants.  Id.  Acerra and Robinson pleaded guilty to fourteen counts of criminal conduct; Brazil was not charged with criminal wrongdoing but, after being granted immunity, admitted his involvement in the wrongdoing.  Id. at 764 & n.12.  We also noted that Acerra, Robinson, and Brazil "were each directly involved in the investigation and prosecution of the defendant."  Id. at 764-765.  Brazil testified at trial "to the circumstances and content of the defendant's statement to the police."  Id. at 765.  Acerra and

Robinson did not testify at trial, but both testified at the hearing where the defendant's motion to suppress the identification of the defendant by Sanchez was denied. Id. The defendant argued that "evidence of [the detectives'] misconduct in other investigations should be admissible (1) to impeach their credibility concerning the photographic array, and (2) to suggest that Sanchez's identification of the defendant's photograph was the product of corrupt police tactics, and that a new trial is required for this purpose." Id. We concluded that the defendant had failed to meet his burden of showing that Sanchez's identification was "unnecessarily suggestive" and therefore should have been suppressed, because there was an "absence of evidence, by affidavit or otherwise, suggesting that the subject detectives procured false evidence in connection with the investigation of this defendant." Id.

2. Second motion for a new trial. On March 13, 2013, the defendant filed a second motion for a new trial, arguing that he was entitled to a new trial because of newly discovered evidence and the Commonwealth's failure to disclose exculpatory evidence. In support of his motion, the defendant offered documentary evidence obtained through public records requests. The judge assigned to hear the motion, who was not the trial judge,[9]

---

[9] The trial judge had retired.

allowed the defendant's request for further discovery, which resulted in additional documentary evidence on which the defendant relies.  In addition to considering the documentary evidence, the motion judge held an evidentiary hearing over the course of seven days.  The testimony focused on three issues: the alleged inadequacies in the investigation, the involvement of corrupt detectives in the investigation, and the discovery that was provided to the defendant's trial counsel.

In her decision allowing the motion for a new trial, the judge identified various categories of evidence that she concluded were newly discovered:  (1) information regarding the theft on September 9, 1993, seventeen days before the victim's death, of approximately $26,000 from Robert Martin by Detectives Robinson, Acerra, and Kenneth Beers, Sergeant Detective Leonard J. Marquardt, and the victim (Martin theft); (2) Federal Bureau of Investigation informant reports (FBI informant reports); (3) information regarding an allegation by Boston police Detective George Foley that the son of a Boston police officer had told him in late August, 1993, that his father was going to kill the victim because the victim would not leave the son's fourteen year old sister alone (Foley allegation); (4) information from Boston police anti-corruption division (ACD) files regarding Detective Robinson and the victim together robbing two mid-level drug dealers of a large sum of money in or around May of 1992

(drug dealer robbery); (5) information from ACD files regarding the victim obtained through Ronald Hansen (Hansen report); and (6) tips from the Boston police "hotline" established after the victim's killing to obtain investigative leads (hotline tips). We briefly summarize the most relevant information in the judge's findings regarding each of these categories of evidence.

a. Martin theft. As described in the Federal grand jury testimony of Martin and his roommate in September and October, 1996, respectively, and an ACD report of Martin's interview with an investigator, Martin was stopped on September 9, 1993, by Detectives Robinson, Acerra, and Beers, along with the victim and Sergeant Detective Marquardt, while Martin was in a vehicle conducting a sale of marijuana with another individual. Acerra identified himself as an "INS" officer and gave a false name during the encounter. The detectives confiscated Martin's knapsack, which contained seven pounds of marijuana, and served Martin with a search warrant for his apartment. Robinson and Acerra took Martin's keys and left Martin in the vehicle "guarded by" the victim. Robinson later returned to the vehicle and told Martin to come to the apartment to open a safe, which Martin did. The safe contained twenty-two pounds of marijuana. The victim appears to have entered the apartment either with Martin or after Martin left the vehicle.

Martin's roommate arrived at the apartment to find Martin, Martin's girl friend, and another friend of Martin being detained by the detectives. Two detectives took the roommate to his room and asked him to open a safe, from which they confiscated marijuana. Robinson then took Martin to a second apartment with Acerra and Marquardt to open another safe, leaving the victim and Beers in the first apartment to detain Martin's roommate and the others. When the detectives asked Martin to open the safe in the second apartment, Martin asked Marquardt whether, in exchange, the detectives would release Martin's friends. Marquardt told him he would release them only if there was more money in the safe, because they had found only $8,000.[10] When Martin opened the safe, Acerra removed approximately $18,000 to $20,000. After a telephone call from one of the detectives at the second apartment, the roommate and the others were released. The police report documenting the execution of the warrant, which was signed by both Detective Robinson and the victim, declares that "several pounds of marijuana" and drug paraphernalia were seized; the report makes no reference to the seizure of any money.[11]

---

[10] The detectives already had found $8,000 that Robert Martin kept in a filing cabinet in that apartment.

[11] The Federal indictment against Detectives Walter Robinson and Kenneth Acerra stated that Robinson falsely reported in the search warrant inventory that only $14,000 was seized.

b. <u>FBI informant reports</u>.  An FBI informant who had "an intimate knowledge" of the victim reported on November 12, 1993, that the victim "regularly . . . 'shook down' pimps, prostitutes, and drug dealers for money."  The victim, according to this informant, also dealt drugs, extorted other police officers, and "used every means available to blackmail people."  The informant "has heard often that [the victim] committed murder as a cop."

An FBI informant reported on November 1, 1993, that Detective Foley was recently disciplined for accusing Officer Raymond Armstead, Sr. (Armstead Sr.) of involvement in the victim's murder.  The reports also contain allegations that the victim was a "rogue" officer who "[shook] down" bar owners, bookmakers, and the owners of second-hand jewelry stores, and paid a prostitute to drop charges against a third party.  The reports also reveal that the victim "'liked' young black girls" and was the subject of a Federal investigation as early as 1986.

c. <u>Foley allegation</u>.  Detective Foley was originally assigned to the Boston police task force that was constituted in the wake of the victim's death to investigate his murder (task force).  On September 30, 1993, Detective Foley related to several detectives that, in August of that year, he was investigating threats made against Raymond Armstead, Jr. (Armstead Jr.), a correction officer for the Suffolk County

sheriff's department and son of Armstead Sr. Detective Foley reported that Armstead Jr. told Foley that his father had a "beef" with the victim because the victim would not "leave [Armstead Jr.'s] fourteen year old sister alone." Foley stated that Armstead Jr. told Foley that his father was going to kill the victim and that his father knew that the victim worked a detail at Walgreens and slept in his vehicle during the detail. Foley said that Armstead Jr. told him that Foley would "read about it in the papers" that the victim had been "[s]hot between the eyes at Walgreens."

A report authored by Sergeant Detective Daniel Keeler stated that, later in the day on September 30, Keeler and Sergeant Detective Thomas J. O'Leary met with Armstead Jr. to discuss the allegations. During this interview, Armstead Jr. confirmed that Foley had investigated the threats against Armstead Jr. but denied telling Foley that his father was going to kill the victim, denied knowing the victim, and denied that the victim had any involvement with a younger sister, stating that he was the youngest child in his family.[12]

---

[12] In 2014, Boston police detectives contacted retired Officer Raymond Armstead, Sr., to inquire about his children. Officer Armstead informed the detectives that, in 1993, he had four daughters: two biological daughters and two foster daughters. Officer Armstead further stated that in 1993 one of his foster daughters was twelve or thirteen years old.

Confronted with the information elicited from Armstead Jr., Foley said that he may have been "totally wrong," but ultimately insisted that he was telling the truth. At 11:30 P.M. on September 30, Captain Detective Edward J. McNelley told Foley that the information he had supplied was false. McNelley concluded that Foley was suffering from "severe emotional depression" and was unable to perform his duties, so he requested that Foley surrender his gun and badge, and relieved him of duty. Foley later received treatment at a hospital. A psychological evaluation concluded that Foley could return to work and carry a gun.

d. Drug dealer robbery. An ACD report dated November 17, 1993, reported that an anonymous tipster had reported that, eighteen months earlier, the victim and Robinson had robbed two drug dealers at gunpoint. The reliability of the tip was rated "good," and an ACD lieutenant met with the tipster that day and learned that the robbery involved a large sum of money.

e. Hansen report. The ACD files contained notes from an interview with Ronald Hansen, dated May 9, 1996. Detective Robinson used Hansen and Hansen's ex-wife as informants. The interview notes recount that the ex-wife had known the victim since she was sixteen years old and that the victim "used to take young girls for rides in his car." The notes also state that Detective Robinson asked Hansen if he knew anything about

the victim's murder and Hansen responded that the victim "took drugs from the girl friend of one of the killers and told her if her boy friend wanted the drugs back he would have to come and see [the victim] or he'd arrest her." Hansen added that "[o]ne of the girls killed in Mattapan was the girl friend," apparently referring to one of the defendant's cousins who was killed on September 29, 1993. See note 4, supra. The notes also reflect that another detective asked the ex-wife if the victim carried a .25 caliber gun on his ankle, and she answered that the victim did.

f.  Hotline tips.  The same day as the victim's shooting, the Boston police department publicized a hotline for people to call with tips regarding the victim's murder. While the motion for a new trial was being litigated, the defendant requested and the Commonwealth disclosed written reports of the tips received on the hotline, some of which the defendant had received in redacted form from a prior public records request.

Many of the tips allege or suggest that someone other than the defendant committed the murder or participated in the murder. The notes memorializing the tips show, among other things, that (1) on the afternoon of September 26, 1993, a detective "called and stated that his brother . . . , who is a guard at South Bay . . . told him that an inmate, William Bell, told [his brother] that a drug dealer, named Armstead, had a

contract out on [the victim]"; (2) a tip dated September 30, was purportedly from a taxicab driver who drove the victim's girl friend to the parking lot the night of the murder where she shot him with a .25 caliber gun that the victim had given her for self-defense;[13,14] (3) police received two separate tips, one on September 27, 1993, and another on September 29, alleging that a "Royce Hill" was an accomplice to the shooting; and (4) police received three separate tips stating that someone at the Essex County house of correction had information relating to the victim's murder.

At the evidentiary hearing on the second motion for a new trial, Sergeant Detective O'Leary testified that he was the "shepherd" of the victim's homicide investigation, and that, as tips came in, "they were handed out" to pairs of investigators who were part of the task force engaged in the homicide investigation. O'Leary stated that he would write the names of the detectives he assigned to investigate the tip on the report of the tip and that those detectives should have documented any

---

[13] Another tip, also dated September 30, 1993, stated that the victim kept a .25 caliber firearm in his closet that his girl friend did not know about.

[14] One witness gave a statement to police on September 27, 1993, in which she said that she was at the Walgreens on the night of the shooting, arriving at approximately 2:50 A.M. She stated she saw a woman, who was white and in her mid-thirties to early-forties, in the victim's car talking to the victim. She did not testify at trial.

investigation that was done to follow up on the tip in a report that was filed with him. He admitted, however, that there was only one tip that showed that detectives had been assigned to investigate it, and that the tip had been assigned to Sergeant Detective Marquardt and Detective Acerra. O'Leary further conceded that there are no reports or records showing that any investigation was done to follow up on any of the tips received on the hotline.

The judge concluded that these six categories of newly discovered evidence showed that the investigators "failed to vigorously pursue other leads" and, when combined with evidence of the "conflict of interest" of Acerra, Robinson, and Brazil, formed the basis for "a potentially powerful" defense under Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).[15] The judge found that Robinson, Acerra, and Brazil "were involved in nearly every aspect of the homicide investigation" that resulted in the defendant's prosecution. All three were on the fifty-person task force conducting the investigation. Acerra and Marquardt were among the first to enter the victim's home after he was killed.[16] Acerra and Brazil were the first to respond to

---

[15] The judge left open the question whether any of the newly discovered evidence would be admissible as evidence of a third-party culprit; she did not rest her decision on this ground.

[16] Tina Erti, the roommate of the victim's girl friend, reported that after the girl friend learned about the victim's

Sanchez's home on the day of the killing. Acerra and Robinson were present when Sanchez was first shown the photographic array and were with Sanchez after she selected the photograph of someone other than the defendant and before she identified the defendant. Acerra and Detective Richard Ross found the victim's cellular telephone below a tray in the center console of the victim's vehicle on October 1, even though an inventory search of the vehicle had been conducted on the day of the shooting and a cellular telephone was not among the twenty-two items listed in the inventory.[17] Acerra and Robinson drove Headen, who allegedly hid the firearms in the field, to the police station to be interviewed on October 12, 1993.[18] Brazil was one of the

---

death, the girl friend went to his apartment to look for money she knew he kept there. She did not find the money and told Detective Robinson, who said the police had taken it.

[17] Both Sergeant Detective Thomas O'Leary and Detective Robert Foilb, who took custody of the cellular telephone after it was recovered, testified they were unaware of any steps taken to examine the contents of the cellular telephone for any information, such as the last call made or received. Foilb testified that the telephone was processed for fingerprints but no fingerprints were found on the telephone, including the victim's.

[18] On October 2, 1993, five days before the two firearms, including the .25 caliber handgun with a pearl handle that was determined to be the murder weapon, were found in the field, Detectives John McCarthy, Randall Halstead, and Dennis Harris interviewed Tina Erti, the roommate of the victim's girl friend, and asked, "Have you ever seen [the victim] with a small caliber gun with a pearl handle?" Erti answered, "Never."

detectives who questioned the defendant, and he was one of the

detectives who interviewed the defendant's uncle.[19]

> The conflict of interest the judge identified was that

> "Detectives Brazil, Acerra, and Robinson had a personal
> interest in solving [the victim's] homicide as quickly as
> possible before any members of the . . . [t]ask [f]orce,
> who were not part of the corruption scheme, or anyone else,
> could look further into why [the victim] may have rubbed
> people the wrong way or was rumored to be a 'dirty cop.'
> In other words, they needed to prevent others from finding
> out that they and [the victim] had been engaging in illegal
> activities."  (Emphasis in original.)

The judge stated that, with this newly discovered evidence, the

defendant could have argued that the corrupt detectives

"compromised potential evidence of the identity of [the

victim's] killer while attempting to conceal evidence of their

own wrongdoing."

> The judge also found that

> "[t]he newly discovered evidence would have further
> supported a powerful Bowden defense by revealing that the
> Commonwealth failed to investigate numerous other parties
> with reason to kill [the victim].  Such a defense could
> have raised a reasonable doubt as to whether, as the
> Commonwealth claimed at trial, [the defendant] decided to

---

[19] The defendant's uncle testified at the first two trials, but not at the third trial.  In his statement to police, the uncle stated that the defendant told him that he (the defendant) went to Walgreens to buy diapers.  The defendant said that, when he left the store, he noticed that Patterson's vehicle was no longer in the parking lot, but was parked across the street near some bushes.  He then saw Patterson run towards him, urging him to come.  When they got to the vehicle, Patterson told him that he (Patterson) had shot someone, and handed the defendant two guns, which the defendant and Patterson later placed in plastic bags and buried.  The defendant made clear to the uncle that he was not the shooter.

kill [the victim] simply because the opportunity presented itself."

The judge concluded that the newly discovered evidence of the conflict of interest of Acerra, Robinson, and Brazil, and the Boston police department's "failure to follow up on leads implicating third-party suspects is material, credible, and would have been a real factor in the jury's deliberations," such that "this is a case where justice has not been done."[20]

Discussion.  The Commonwealth essentially makes three challenges to the motion judge's new trial order.  First, the Commonwealth contends that the judge was clearly erroneous in finding that the Foley allegation and the hotline tips were newly discovered.  Second, the Commonwealth claims that, in considering the first motion for a new trial, the motion judge and this court knew of the evidence of police corruption committed by Detectives Acerra, Robinson, and Brazil and the defendant therefore is barred by the principle of direct estoppel from relitigating this issue in a second motion for a

---

[20] The motion judge also concluded that the drug dealer robbery information, the reports on the Foley allegation, and the hotline tips were exculpatory evidence that the Commonwealth failed to disclose in violation of its constitutional obligation to do so under Brady v. Maryland, 373 U.S. 83, 87 (1963).  The judge concluded that this Brady violation "provides an additional basis" for ordering a new trial.  Because we rest our affirmance of the judge's new trial order on the ground of newly discovered evidence, we do not set forth her findings regarding a Brady violation or otherwise address it.

new trial.  Third, the Commonwealth argues that the motion judge abused her discretion in ordering a new trial.  We address each of these three arguments.

1.  <u>Newly discovered evidence</u>.  Evidence is newly discovered if it "was unknown to the defendant or trial counsel and not reasonably discoverable at the time of trial" or at an earlier motion for a new trial.  <u>Commonwealth</u> v. <u>Cowels</u>, 470 Mass. 607, 616 (2015), quoting <u>Commonwealth</u> v. <u>Shuman</u>, 445 Mass. 268, 271 (2005).  See <u>Commonwealth</u> v. <u>Grace</u>, 397 Mass. 303, 306 (1986).  The Commonwealth claims that the judge's finding that the Foley allegation and the hotline tips were newly discovered was clearly erroneous because it had disclosed this information to defense counsel before the third trial.[21]  The Commonwealth points to the testimony at the evidentiary hearing on the motion for a new trial presented by the lead prosecutor on the case, Assistant District Attorney Phyllis Broker (the prosecutor).  Sergeant Detective O'Leary testified that he had numbered and indexed all the police reports filed in the investigation, and numbered and indexed the hotline tips into two indices:  one of tips about the murder generally and another of tips regarding the Volkswagen that eventually became a focus of the

---

[21] The Commonwealth does not challenge the judge's finding regarding the other newly discovered evidence.

investigation. He further testified that he had turned over all of the numbered and indexed reports to the prosecutor.

The prosecutor testified that she had no memory of her disclosure of specific items of discovery in the defendant's case but recalled that her routine practice regarding discovery was to disclose "everything" unless there was a reason not to, in which case she would "have a hearing on it." In producing discovery to defense counsel, she would number the police reports as they came in, make copies, and then write a discovery letter enclosing the reports and referencing them by number.

As to the Foley allegation, the prosecutor testified from her review of the Commonwealth's files that a copy of Detective Keeler's report regarding Detective Foley's allegations was numbered 186, that this number was circled, and that there is a corresponding entry referencing the Keeler report in an index of police reports that she created. She testified that this was consistent with her routine practice and indicative that she turned over the report to defense counsel.[22]

---

[22] The Commonwealth also cites a letter to the prosecutor from one of defendant's trial counsel that asks about missing attachments to a document numbered 184 "in [the Commonwealth's] initial discovery list." The Commonwealth argues that this letter shows that defense counsel was provided with the index of police reports that included a reference to the report of Detective Daniel Keeler, which was numbered 186, and therefore either received the Keeler report or were on notice of its existence.

As to the hotline tips, the Commonwealth points to two indices of the hotline tips in the Commonwealth's files that have the handwritten words "given to counsel" on the first page. the prosecutor testified that the handwriting is hers and indicates that she provided the indices, and inferentially the reports of the tips themselves, to defense counsel.

The defendant, however, introduced evidence suggesting that the discovery process in his case was not as orderly as it appeared. The defendant introduced two versions of indices of police reports related to the investigation, which contain the same documents numbered somewhat differently. The defendant also introduced several transmittal letters that enclosed discovery sent by the prosecutor to the defendant's trial counsel. These discovery letters showed that some documents that were disclosed to the defense were not referenced by number, that those documents that were referred to by number were not disclosed sequentially -- one letter enclosed seven documents including one document numbered 138 and one document numbered 197 -- and that at least one of the documents referred to by number in a discovery letter did not correspond to the prosecutor's numbered index, which she claims listed all of the documents disclosed to the defense.

Attorneys David Duncan and Norman Zalkind, the defendant's trial attorneys, testified that they did not receive any report

of the Foley allegation or any hotline tips alleging that third parties were involved in the victim's murder. In addition to having no recollection of receiving those materials, trial counsel testified that, if they had received them, they either would have sent an investigator to follow up on the allegations or would have filed discovery motions seeking additional information from the Commonwealth, but they did neither in this case. The defendant also introduced evidence showing that, when the defendant's trial counsel received a letter from then State Senator Diane Wilkerson stating that she had received a telephone call from a person claiming to have information about the victim's murder and attaching her notes of the call, they filed a discovery motion that sought information from the Commonwealth regarding those allegations.

We conclude that the judge's finding that the Foley allegation and the hotline tips were newly discovered was not clearly erroneous. The judge was entitled to credit the testimony of the defendant's trial counsel that they did not receive this information and that, if they had, they surely would have followed up on it through additional investigation or requests for further discovery. In addition, where there was evidence of irregularities in the discovery process, the judge also was not obliged to find that these documents had been furnished in discovery based on the numbering and indexing of

investigative documents and on the prosecutor's description of her routine discovery practices.

2. _Direct estoppel_. The Commonwealth contends that the newly discovered evidence adds nothing material to what was presented to the judge in the first motion for a new trial and, on appeal, to this court when we affirmed the defendant's convictions and the denial of the motion for a new trial after plenary review under G. L. c. 278, § 33E. It correctly notes that we knew then that Detectives Acerra, Robinson, and Brazil had been implicated in submitting false search warrant applications and affidavits in other cases and in illegally seizing property and money while executing those fraudulent warrants, and that Acerra and Robinson had pleaded guilty to Federal indictments arising from those allegations. _Ellis_, 432 Mass. at 764. It also correctly notes that the defendant attached to his first motion for a new trial a Boston Globe article, dated February 18, 1996, reporting that the Boston police "anticorruption unit" was investigating Detective Robinson and the victim for their alleged involvement in the robbery of money from two drug dealers in 1991. Because this information was known to us when we concluded, after reviewing the entire record under § 33E, that we found "nothing that compels us to exercise our discretion to disturb the jury's verdict," _id_. at 765-766, the Commonwealth contends that the

motion judge should have denied the defendant's motion for a new trial "based on the principle of direct estoppel," and cites Commonwealth v. Rodriguez, 443 Mass. 707, 709-712 (2005), in support of this argument.  We disagree.

In Rodriguez, supra at 710-711, we declared that, where a defendant "raises no new factual or legal issue" in a motion under Mass R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), and simply seeks to relitigate a motion that was previously denied by the motion judge and rejected on direct appeal, "principles of direct estoppel operate as a bar to the defendant's attempt in [the] rule 30 (b) motion to relitigate issues."  For direct estoppel to apply, however, "the Commonwealth must show that the issues raised in the defendant's rule 30 (b) motion were actually litigated and determined on the defendant's original motion," which here means the defendant's first motion for a new trial.  Id. at 710.

In affirming the denial of the first motion for a new trial, we recognized that Detectives Acerra, Robinson, and Brazil had engaged in police misconduct in other cases, but we concluded that the defendant had failed to meet his burden of furnishing evidence "suggesting that the subject detectives procured false evidence in connection with the investigation of this defendant."  Ellis, 432 Mass at 765.  We did not know at that time that these detectives had been engaged with the victim

in criminal acts of police misconduct as recently as seventeen days before the victim's murder.[23]  The complicity of the victim in the detectives' malfeasance fundamentally changes the significance of the detectives' corruption with respect to their investigation of the victim's murder.  Without the victim's complicity, the defendant could argue that these detectives had engaged in misconduct with respect to other investigations and therefore might have been more likely to have engaged in misconduct with respect to this investigation.  But with the victim's complicity, these detectives would likely fear that a prolonged and comprehensive investigation of the victim's murder would uncover leads that might reveal their own criminal corruption.  They, therefore, had a powerful incentive to prevent a prolonged or comprehensive investigation, and to discourage or thwart any investigation of leads that might reveal the victim's corrupt acts.  This issue was not "actually litigated and determined on the defendant's original motion," see Rodriguez, 443 Mass. at 710-711, and therefore is not barred by direct estoppel.

---

[23] The Boston Globe article that was in the record in our affirmance of the denial of the first motion for a new trial reported simply that Detective Robinson and the victim were under investigation for an alleged robbery of two drug dealers two years before the murder.  This information, standing alone, falls well short of admissible evidence demonstrating the victim's corrupt relationship with the investigating detectives.

3.  Abuse of discretion.  Having determined that the judge did not clearly err in her findings on the newly discovered evidence and that her consideration of the issue is not barred by direct estoppel, we now address whether the judge abused her discretion in concluding that "justice has not been done" and ordering a new trial.  See Mass. R. Crim. P. 30 (b) ("The trial judge . . . may grant a new trial at any time if it appears that justice may not have been done").

"Whether an appeal is from the granting or the denial of a motion for a new trial, an appellate court will examine the motion judge's conclusion only to determine whether there has been a significant error of law or other abuse of discretion." Grace, 397 Mass. at 307.  See Commonwealth v. Raymond, 450 Mass. 729, 733 (2008).  "Under the abuse of discretion standard, the issue is whether the judge's decision resulted from 'a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives.'"  Commonwealth v. Kolenovic, 471 Mass. 664, 672 (2015), quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

A judge may order a new trial where newly discovered evidence "casts real doubt on the justice of the conviction." Cowels, 470 Mass. at 616, quoting Grace, 397 Mass. at 305.  To conclude that the evidence casts real doubt on the justice of

the conviction, "[t]he motion judge decides not whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury's deliberations."  Cowels, supra, quoting Grace, supra. Consequently, the issue before us is whether the judge made a clear error of judgment in determining that the newly discovered evidence "would probably have been a real factor in the jury's deliberations."  See Cowels, supra.

The Commonwealth contends that there is no doubt cast on the justice of the convictions because none of the newly discovered evidence affects the compelling evidence that the defendant was in possession of the murder weapon and the victim's service pistol and that he caused the weapons to be discarded in a field in the days following the killing.  The Commonwealth notes that the judge did not vacate the defendant's convictions from the first trial of the unlawful possession of these firearms and that the defendant does not challenge these convictions on appeal.  The Commonwealth contends, in essence, that given the defendant's possession of these weapons, the newly discovered evidence regarding the victim's complicity with the corrupt detectives and the unexplored leads regarding third-

party culprits is nothing more than "a tale . . . , full of sound and fury, signifying nothing."[24]

We agree that the defendant's possession and concealment of these weapons only days after the killing, combined with the evidence that he was at the Walgreens at or about the time of the killing, is evidence that he was involved in the killing in some fashion.  And, had the defendant been charged with being an accessory after the fact to this murder, this evidence would be more than sufficient to support his conviction of that indictment.  See Commonwealth v. Simpkins, 470 Mass. 458, 462 (2015).  But, as demonstrated in the first trial, where the jury found the defendant guilty of the firearm indictment but were unable to reach a verdict regarding the indictments for murder and armed robbery, his possession and concealment of these firearms does not necessarily mean that he was the shooter or knowingly participated with Patterson in the shooting.  See id. at 461-463.  See also Commonwealth v. Zanetti, 454 Mass. 449, 470 (2009) (Appendix).  There are at least two alternative scenarios that a jury would need to reject in order to find the defendant guilty of armed robbery and murder.

First, the jury would need to reject the possibility, argued in closing by the defendant, that Patterson alone shot

---

[24] William Shakespeare, MacBeth act V, scene 5.

the victim, without the defendant's knowing participation, and then passed the murder weapon and the victim's service weapon to the defendant. The strongest evidence of the defendant's knowing participation in the murder was the testimony of Rosa Sanchez, who testified that at approximately 3:05 A.M., which was between thirty and forty-five minutes before the victim's shooting, she saw a man she later identified as the defendant "crouching by" the victim's vehicle in front of the Walgreens where the victim sat sleeping. No doubt for this reason, much of the defendant's closing argument was devoted to challenging the accuracy of her testimony. Trial counsel noted in closing argument that she had said nothing to the store clerk or her husband about this suspicious behavior at the time of the event; she instead went to look at greeting cards inside Walgreens. Counsel also noted in closing argument that Acerra, whom Sanchez knew, was with her when she was shown the photographic arrays, that she was told to "pick out the guy,"[25] and that Acerra was a "close friend" of the victim.[26]

It is not difficult to imagine how different the defendant's closing argument would have been had he known then

---

[25] On cross-examination, Sanchez agreed that Detective Richard Ross told her to "pick the guy out."

[26] Defense counsel did not mention that Detective Robinson was with Detective Acerra.

that Acerra not only was a close friend of the victim, but also was complicit with the victim in criminal acts of police corruption, including a theft of thousands of dollars in cash from a marijuana dealer earlier that month. Defense counsel could have argued that the detectives had a strong motive to shore up the case against the two men in the Volkswagen -- suspects unconnected to the detectives' involvement with the victim in illegal activities -- by ensuring that they obtained an identification of one of them in an incriminating position shortly before the shooting. Defense counsel could further have argued that, in addition to motive, Detectives Robinson and Acerra had the opportunity to strengthen the case against the defendant and Patterson by leaning on Sanchez to pick the "right" person immediately after she had picked the "wrong" person. Sanchez's identification of the defendant was already suspect because she initially had identified someone else -- the same person whom her husband selected -- as the person she saw crouching near the victim's vehicle, and because she claimed to be rattled by the photograph of her stalker in the array, but later was unable to identify the photograph of the person she said had stalked her. We cannot say with confidence that a reasonable jury would have credited her identification if they had known of the newly discovered evidence regarding the

victim's complicity with the corrupt detectives who helped procure the identification.

Second, the jury would also need to reject the possibility that someone other than the defendant and Patterson shot the victim, and that the defendant somehow recovered and took possession of the murder weapon and the victim's service weapon after the killing.  This was not an argument presented by the defendant at trial, but as the judge noted, the defense strategy may have changed had the newly discovered evidence been known to the defense.  As the motion judge noted, the newly discovered evidence revealed that many individuals had a motive to kill the victim because of his various misdeeds, that there were investigative leads indicating that others may have been responsible for his murder, and that, apart from the Foley allegation, none of these leads was explored.[27]  The newly discovered evidence also would have provided an explanation why these leads were not explored -- that corrupt detectives did not wish any of these leads to uncover evidence that might reveal their own criminal misconduct.

---

[27] Defense counsel could have argued that even the exploration of the Foley allegation was inadequate, in that the two detectives only interviewed Raymond Armstead, Jr., and failed to confirm a verifiable fact upon which the allegation was premised:  that Armstead Jr. had a teenaged sister.

Perhaps most important, with this newly discovered evidence, a reasonable jury likely would have had diminished confidence in the integrity and thoroughness of the police investigation in general.  Not only would this likely have caused them to question the reliability of some of the evidence presented by the prosecution, it also may have elevated in significance certain aspects of the investigation that may otherwise have appeared unimportant.  For instance, how did the police know to ask Tina Erti, the roommate of the victim's girl friend whether the victim possessed a small caliber gun with a pearl handle five days before a small caliber gun with a pearl-colored handle was found that was later determined to be the murder weapon?[28]  Did this suggest that the police had information that the victim had been shot with his own firearm, which would itself suggest the possibility that the victim was killed by someone he knew (or by someone assisted by someone he knew)?

The Commonwealth argues that the newly discovered evidence is limited only to Bowden evidence that impeaches the investigation by the police and that we have previously stated that "[n]ewly discovered evidence that tends merely to impeach the testimony of a witness does not ordinarily warrant a new

---

[28] See note 18, supra.

trial." Commonwealth v. McGee, 467 Mass. 141, 150 (2014),
quoting Commonwealth v. Simmons, 417 Mass. 60, 72 (1994).  We
agree that it would be a rare case where newly discovered Bowden
evidence alone would warrant a new trial.  But it is a rare case
where police detectives investigating the killing of another
police detective were complicit with the victim in numerous
recent acts of criminal police misconduct and where the
integrity of the investigation was potentially compromised by
their conflicting interest in ensuring that the investigation of
the murder did not uncover their own criminal misdeeds.

In discussing the admissibility of Bowden evidence, we have
said that

> "the inference that may be drawn from an inadequate police
> investigation is that the evidence at trial may be
> inadequate or unreliable because the police failed to
> conduct the scientific tests or to pursue leads that a
> reasonable police investigation would have conducted or
> investigated, and these tests or investigation reasonably
> may have led to significant evidence of the defendant's
> guilt or innocence.  A jury may find a reasonable doubt if
> they conclude that the investigation was careless,
> incomplete, or so focused on the defendant that it ignored
> leads that may have suggested other culprits."

Commonwealth v. Silva-Santiago, 453 Mass. 782, 801 (2009).
Implicit in this description of the potential inferential
significance of Bowden evidence is that the investigation,
however flawed, was conducted in good faith by honest police
officers.  Where, as here, the newly discovered Bowden evidence
raises substantial doubts regarding the good faith and honesty

of some of the investigating detectives, its potential inferential significance is multiplied many-fold, because a jury reasonably may have had diminished confidence in the integrity and good faith of the investigation and the evidence that arose from it.

The determination of whether newly discovered evidence would have been a real factor in the jury's deliberations requires that the new evidence be considered in light of the totality of the evidence presented at trial, and the evidence supporting the defendant's knowing participation in the murder and armed robbery in this case was not overwhelming. There was no eyewitness to the shooting and no physical evidence linking the defendant to the victim's vehicle.[29] Sanchez's identification of the defendant occurred only after she identified another individual from the photographic array. The motive offered by the Commonwealth -- that the defendant saw a police officer sleeping in his vehicle when he went to Walgreens to purchase diapers and hatched a scheme to kill him and take his service weapon as a trophy -- is not particularly compelling. Although several witnesses testified to seeing

---

[29] As already noted, the only physical evidence linking Patterson to the victim's vehicle were the fingerprints identified as belonging to him, and this expert opinion was subsequently determined by this court not to meet the reliability standards necessary for admission at trial. See note 8, supra.

people matching the descriptions of the defendant and Patterson in the Walgreens parking lot and surrounding areas, the significance of that evidence is limited by the defendant's admission early in the investigation that he was at Walgreens that night.  The strongest consciousness of guilt evidence is the alteration of Patterson's vehicle after the shooting, but there is no evidence that the defendant participated in that alteration.

When we consider the newly discovered evidence together with the totality of the evidence presented at trial, we conclude that, in the unusual circumstances of this case, the judge did not abuse her discretion in determining that the newly discovered evidence "would have been a real factor in the jury's deliberations" and that a new trial is required for justice to be done.

Conclusion.  The motion judge did not abuse her discretion in ruling that the newly discovered evidence warrants a new trial.  The order allowing the defendant's motion for a new trial as to the indictments of murder and armed robbery is affirmed.

So ordered.